(276 P.3d 819)
No. 106,152

STATE OF KANSAS, *Appellee,* v. TROY E. DUGAN, *Appellant.*

—

Opinion filed May 4, 2012.

*Michael S. Mogenson* and *Edward C. Gillette*, of Gillette Law Firm, P.A., of Mission, for appellant.

*Samantha Clark*, legal intern, *Patrick J. Hurley*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREENE, C.J., ATCHESON, J., and BRAZIL, S.J.

ATCHESON, J.: The United States Constitution draws a line at the threshold of a person's home over which law enforcement officers may not step without a warrant from a judge or exigent circumstances so compelling as to override that fundamental right. The Fourth Amendment's prohibition against unreasonable searches of dwellings or seizures of their occupants reflects a tenet the founders considered essential to the ordered liberty they fought a war to achieve and then cherished as this nation matured. That prohibition is no less significant nearly two and a half centuries into this country's maturation. The comparatively mundane facts of this case belie the magnitude of the constitutional right and the significance of the constitutional issue—when government agents may claim exigency to override Fourth Amendment protections of citizens in their own homes.

## I. FACTUAL AND PROCEDURAL HISTORY

The Douglas County District Court denied a motion to suppress evidence a Lawrence police officer obtained after she stuck her

foot in a garage door to keep it from closing and then entered a private home to search and seize Defendant Troy E. Dugan based on a reported misdemeanor traffic offense. The district court found the officer's actions did not offend the Fourth Amendment to the United States Constitution. Although the question might be closer than some, we do not share the district court's tolerance for the governmental breach of a private residence and, therefore, reverse that ruling with directions the motion be granted.

The salient facts may be set forth in short order. About 1 p.m. on September 19, 2009, Dugan was driving his black SUV in downtown Lawrence when he rear-ended a sedan that had lawfully stopped at an intersection. Rather than stopping, checking on the welfare of the other driver, and exchanging insurance information as the law required, Dugan drove off. Several witnesses saw the collision and furnished general physical descriptions of Dugan. Someone caught the tag number on Dugan's SUV and informed the police.

The police dispatcher then put out a radio call with a description of the SUV, its tag number, Dugan's name and address, and the vehicle's involvement in a hit-and-run accident resulting in a personal injury. Leaving the scene of such an injury accident is a Class A misdemeanor under state law, K.S.A. 8-1602, and the comparable municipal ordinance.

Lawrence Police Officer Laurie Scott heard the dispatch and positioned her patrol car on a side street in anticipation the SUV would pass by her going from the scene of the collision to Dugan's residence. Scott's hunch proved prescient. An SUV matching the dispatcher's description passed, and Scott began to follow it. Scott saw no damage to the SUV and could not get close enough to make out the tag number. She did not engage the emergency equipment on her patrol car or otherwise attempt to stop the SUV. Scott later testified that the SUV may have sped up some, but she saw nothing suggesting any traffic violations as she followed.

The SUV made a turn into the driveway of the address identified as Dugan's. The driver apparently activated an automatic garage door opener and drove into the garage. Scott engaged the emergency lights on her patrol car after she pulled into the driveway.

As the garage door was coming down, Scott confirmed the tag on the SUV matched the one in the dispatch. She got out of her car, approached the closing door, and stuck her foot beneath it, thereby triggering a safety mechanism causing the door to open. Scott entered the garage and confronted Dugan.

Dugan displayed signs of intoxication—he was unsteady on his feet; his speech was slurred; he had difficulty getting his driver's license in response to Scott's request; and he smelled of alcohol. After a second Lawrence police officer arrived, Dugan said he was aware of the collision and admitted having several beers. Dugan performed poorly on standard field sobriety tests. He was arrested and refused to take a breath test.

The Douglas County district attorney charged Dugan with felony driving under the influence in violation of K.S.A. 8-1567. Dugan had three past DUI convictions. He was also charged with several misdemeanor driving violations. As it turned out, the driver of the other vehicle had injuries so minor she sought no medical attention. The prosecutor eventually reduced that charge to the lesser misdemeanor of leaving the scene of a noninjury accident. But that reduction has no bearing on the legal issues on appeal.

Dugan filed a motion to suppress the evidence the Lawrence police obtained after Officer Scott entered the garage of his home, including the indicators of his intoxication, his performance on the field sobriety tests, his statements, and his refusal of the breath test. The district court conducted an evidentiary hearing and denied the motion. Officer Scott was the State's only witness at the hearing; Dugan testified briefly in support of the motion. The district court tried Dugan on stipulated facts, found him guilty of the DUI and related traffic offenses, and duly sentenced him. Dugan has timely appealed the denial of the motion to suppress.

## II. STANDARD OF REVIEW AND FOURTH AMENDMENT PRECEPTS

In reviewing a district judge's ruling on a motion to suppress, an appellate court applies a bifurcated standard. The appellate court accepts the factual findings of the district judge if they are supported by competent evidence having some substance. The appellate court exercises plenary review over legal conclusions based

upon those findings, including the ultimate ruling on the motion. *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007); see *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). The prosecution bears the burden of proving a search or seizure to be constitutional by a preponderance of the evidence. *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008) (allocation of burden; quantum of evidence); *Thompson*, 284 Kan. at 772 (allocation of burden).

By its express language, the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons [and] houses . . . against unreasonable searches and seizures." To further that right, the Fourth Amendment also requires warrants based on probable cause be presented under oath to a judicial officer and any warrant describe with particularity the places to be searched and the person or objects to be seized. The warrant requirement, thus, interposes an independent reviewing authority—a judge—to assess the sufficiency of the grounds government agents advance for interfering with citizens or their property. To do otherwise would afford those agents largely unchecked authority to carry out searches and seizures on their own assessment of the need for and propriety of those actions. See *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 & n.10, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984). The framers saw the seeds of abuse in unchecked governmental authority and witnessed firsthand the British Crown's deployment of general warrants and writs of assistance to enter homes and businesses and to seize persons and property without particularized cause, largely at the whim of the King's agents. The Fourth Amendment not only sought to shield the citizens of the newly founded United States from similarly oppressive government action but to secure the homes of those citizens against any unreasonable intrusion by the agents of that government. See *Payton v. New York*, 445 U.S. 573, 583-85 & n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) ("It is thus perfectly clear that the evil the [Fourth] Amendment was designed to prevent was broader than the abuse of a general warrant. Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language . . . of the Amendment."); *Stanford v. Texas*, 379 U.S. 476, 482, 85

S. Ct. 506, 13 L. Ed. 2d 431 (1965) (noting antipathy toward both the use of writs of assistance in the Colonies and the use of general warrants to suppress dissenting political voices in England as animating inclusion of the Fourth Amendment in the Bill of Rights); *Boyd v. United States*, 116 U.S. 616, 624-27, 6 S. Ct. 524, 29 L. Ed. 746 (1886) (detailed discussion of British abuses prompting inclusion of Fourth Amendment in the Bill of Rights). The Kansas Constitution Bill of Rights contains essentially the same language in § 15. The Kansas Supreme Court has consistently interpreted the Kansas constitutional protections to be coterminous with the Fourth Amendment. *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010).

The rights secured in the Fourth Amendment are at their zenith when government agents attempt to enter a person's home. *Welsh*, 466 U.S. at 748 ("It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'") (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 [1972]); *Payton*, 445 U.S. at 585-86; *Mascorro v. Billings*, 656 F.3d 1198, 1204-05 (10th Cir. 2011). As the United States Supreme Court underscored in *Payton*: "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." 445 U.S. at 586. Except in carefully circumscribed situations, law enforcement officers, then, violate the Fourth Amendment if they enter a dwelling without either a search warrant for the premises or an arrest warrant for a resident they reasonably believe will be found there. *Welsh*, 466 U.S. at 748-49; *Payton*, 445 U.S. at 490 ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Mascorro*, 656 F.3d at 1204-05.

Those limited instances permitting warrantless entry require government agents to have probable cause coupled with particularized, exigent circumstances to breach the constitutional sanctity of a private residence. *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.

Ct. 1284, 157 L. Ed. 2d 1068 (2004) (" '[A]bsent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within.' "); *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." [quoting *Payton*, 445 U.S. at 587-88]); *State v. Mell*, 39 Kan. App. 2d 471, 481, 182 P.3d 1 (2008). In reviewing the propriety of a warrantless entry, the court must consider the means of entry, the criminal conduct at issue, and the claimed exigency to determine if the search or seizure avoids the constitutional prohibition of unreasonableness cast in the Fourth Amendment. *Illinois v. McArthur*, 531 U.S. 326, 331-34, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001); *State v. Platten*, 225 Kan. 764, 770, 594 P.2d 201 (1979) (nonexclusive list of factors). In other words, do those exigent circumstances create a constitutionally reasonable search or seizure notwithstanding the absence of a judicially authorized warrant? As with much else in the Fourth Amendment realm, the sufficiency of exigent circumstances to excuse the warrant requirement depends upon the totality of the relevant facts in a given case. *Kentucky v. King*, 563 U.S. 452, 462, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) ("[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement."); *United States v. Klump*, 536 F.3d 113, 117 (2d Cir. 2008); *United States v. Rhiger*, 315 F.3d 1283, 1288 (10th Cir. 2003) (no "absolute test for the presence of exigent circumstances" so the determination "depends upon the unique facts of each controversy"); see *Brigham City v. Stuart*, 547 U.S. 398, 406, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (court reviews the factual circumstances of law enforcement officers' warrantless entry into home to determine reasonableness under Fourth Amendment).

Although the Lawrence police officers could have obtained an arrest warrant for Dugan; a search warrant for his home, his vehicle, and his person; or both types of warrant, they did not. To

the contrary, Officer Scott immediately and forcibly intruded into Dugan's home. Officer Scott neither sought nor received consent to enter but, rather, took affirmative steps to prevent the garage door from closing to effect her intrusion. But probable cause either to search or to arrest does not, standing alone, permit law enforcement officers to enter a residence. *Payton,* 445 U.S. at 576 (The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."); *Jones v. United States,* 357 U.S. 493, 497, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958) ("It is settled doctrine that probable cause for belief that certain articles subject to seizure are in a dwelling cannot of itself justify a search without a warrant."). Those circumstances amounting to probable cause, if presented under oath to a neutral judicial officer, will support the issuance of a warrant.

The Lawrence police could have gotten a search warrant. Probable cause for a search warrant requires that government agents possess specific facts leading a reasonable person to conclude evidence of a crime may be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (search warrant may issue when the supporting affidavit establishes "a fair probability that contraband or evidence of a crime will be found in a particular place"); *State v. Bottom,* 40 Kan. App. 2d 155, 161, 190 P.3d 283 (2008), *rev. denied* 287 Kan. 766 (2009). The police department received a description and the tag number of a motor vehicle involved in a hit-and-run accident from known, reliable witnesses; the police matched the tag to Dugan and his residential address; and an officer saw an SUV matching that description and with the same tag number in the garage attached to Dugan's house shortly after the collision. That would furnish enough information to obtain a warrant to search the house, the SUV, and Dugan for evidence related to the offense. The Lawrence police, however, did not proceed in that fashion.

Those circumstances also would have supported issuance of an arrest warrant assuming a witness to the collision or Officer Scott provided a physical description matching Dugan or identified him from a photo array. K.S.A. 22-2302(1); *State v. Thomas,* 273 Kan

750, 752, 46 P.3d 543 (2002) (arrest warrant properly based on affidavit containing information establishing probable cause to believe a crime has been committed and the defendant committed it). With an arrest warrant in hand, police officers could have entered Dugan's residence to take him into custody because they had ample reason to conclude he was there. *Payton*, 445 U.S. at 603 ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."). Dugan could have been searched upon his arrest, and the arresting officers would have had a circumscribed right to search within the house. *Thornton v. United States*, 541 U.S. 615, 620, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004) (law enforcement officers arresting a person in his or her home may search that person and "the area immediately surrounding him [or her]"); *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990) (Law enforcement officers may make a "protective sweep" of a dwelling—a quick, limited look—after arresting a resident if they have a reasonable belief other persons who might pose a threat could be present.); *Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) (After arresting individual in his or her own home based on a valid arrest warrant, law enforcement officers may search the individual for weapons and evidence and the area within the individual's reach for like objects.). The Lawrence police did not proceed in that fashion either.

But the courts have also held that probable cause may be coupled with an exigent circumstance requiring immediate law enforcement intervention, thus rendering the delay to obtain a judicially authorized warrant demonstrably deleterious to police functions in apprehending suspects otherwise likely to evade capture and in preserving evidence otherwise likely to be lost. In effect, the exigent circumstance with its inseparable need for prompt action supplants the warrant requirement of the Fourth Amendment. And, in turn, the search or seizure will be considered constitutionally reasonable. The Lawrence police elected to proceed in that way and, therefore, must have faced exigent circumstances overriding the constitutional mandate for a warrant and the con-

comitant independent judicial evaluation of the need to forcibly enter a private residence.

The courts have generally recognized four types of exigent circumstances that may obviate the warrant requirement: (1) preventing harm to law enforcement officers or others by capturing a dangerous suspect, see *Warden v. Hayden*, 387 U.S. 294, 298-99, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967); (2) securing evidence in the face of its imminent loss, see *King*, 131 S. Ct. at 1853-54; (3) hot pursuit of a fleeing suspect, see *United States v. Santana*, 427 U.S. 38, 42-43, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976) ; and (4) thwarting escape of a suspect, see *Welsh*, 466 U.S. at 754. *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990) (noting those exigent circumstances); *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010) (cataloging exigent circumstances). Those categories of exigency are not exclusive, and the facts of a given case might support some different imperative rendering a search or seizure constitutionally reasonable under the Fourth Amendment without a warrant. *Struckman*, 603 F.3d 743 ("no immutable list of exigent circumstances"); *United States v. Plavcak*, 411 F.3d 655, 663 (6th Cir. 2005). Likewise, the factual scenario in a given case might implicate multiple exigencies, suggesting a greater likelihood of reasonableness. See *Santana*, 427 U.S. at 43 (While hot pursuit "was sufficient to justify the warrantless entry into Santana's house," the narcotics officers also had "a realistic expectation" that Santana would try to dispose of illegal drugs on the premises.).

The courts have recognized an allied exception when a warrantless entry reasonably appears necessary to assist persons who are seriously injured or face imminent injury. *Brigham City*, 547 U.S. at 403 (recognizing emergency assistance doctrine as warrant exception); *State v. Geraghty*, 38 Kan. App. 2d 114, 123-24, 163 P.3d 350 (2007). The emergency assistance exception to the warrant requirement stands on a somewhat different legal footing than the "exigent circumstances." The exigent circumstances all entail conventional law enforcement functions related to taking individuals into custody or securing evidence. As stated, they require the officers have probable cause. The emergency assistance exception

neither implicates that kind of law enforcement action nor requires probable cause. *Brigham City*, 547 U.S. at 403; *Geraghty*, 38 Kan. App. 2d at 122. The emergency assistance exception applies when a government agent enters a dwelling or other private place for the purpose of rendering emergency aid to a person in serious peril. The agent must have a reasonable factual basis to believe an emergency threatening life or property is imminent or ongoing and to believe the place entered is associated with that threat. The agent may not use the emergency as a subterfuge to effect a search for evidence or a seizure of a criminal suspect. 38 Kan. App. 2d at 123-24. This case does not implicate the emergency assistance doctrine.

## III. STATE'S CLAIMED EXIGENCIES INSUFFICIENT

In this case, the State argues hot pursuit and preservation of evidence justified entering Dugan's home without first getting a warrant. We consider each of those bases in turn and find insufficient grounds to support a constitutional entry, a seizure of Dugan, or a search of him or the premises without a warrant. The United States Supreme Court has noted "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welch*, 466 U.S. at 750.

### A. *No Hot Pursuit*

The facts here fail to establish an actual hot pursuit of the sort recognized as a potential exigent circumstance negating the Fourth Amendment's warrant requirement. As a predicate to invoking hot pursuit as an exigent circumstance, law enforcement officers must have both probable cause to arrest the person and probable cause to believe the person may be found in his or her home or some comparable place otherwise requiring a search warrant, such as a hotel room. See *United States v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011) (motel room protected under Fourth Amendment as a house would be). In this case, as we have said, Officer Scott had probable cause to arrest Dugan for the traffic violation and obviously had more than ample reason to conclude he was in his home. Given those circumstances, hot pursuit comes into play as

a warrant exception when the law enforcement officers chase a person who then attempts to evade their efforts to arrest or otherwise take him or her into custody. *United States v. Santana*, 427 U.S. at 42-43 (hot pursuit "means some sort of a chase"); *Struckman*, 603 F.3d at 744 (no chase and no hot pursuit when officers first confronted suspect in backyard of his home and he did not attempt to flee); *United States v. Schmidt*, 403 F.3d 1009, 1015 (8th Cir. 2005) (hot pursuit when officer "gave chase immediately and the chase continued uninterrupted"). In *Santana*, the United States Supreme Court recognized that a person "could not thwart an otherwise proper arrest" by "retreating into her house." 427 U.S. at 42. Law enforcement officers, therefore, may enter a suspect's residence without a warrant to keep the suspect from "defeat[ing] an arrest which has been set in motion in a public place." 427 U.S. at 43. The chase need not be lengthy. In *Santana*, the suspect stood just outside the front door of her residence when narcotics officers drove up to within 15 feet of her, got out of their van, and identified themselves as police. The officers had probable cause to arrest the woman as a drug trafficker based on a controlled buy they had concluded minutes earlier. The suspect bolted into the house. The United States Supreme Court held that the encounter began in a public place for Fourth Amendment purposes—outside the confines of the dwelling and, thus, in an area providing a limited expectation of privacy—and continued as the suspect moved inside to evade the advancing law enforcement officers. 427 U.S. at 40, 42-43.

For Fourth Amendment purposes, then, "hot pursuit" entails law enforcement officers chasing a suspect immediately following the apparent commission of a crime in a manner that the suspect actually had or reasonably should have identified them as government agents attempting to stop him or her. Assuming the officers otherwise had probable cause linking the suspect to the crime, they could make an arrest on that basis in a public place consistent with the Fourth Amendment. The suspect would thwart that constitutional exercise of government authority by fleeing and would do so deliberately. That scenario would, then, present at least a colorable

claim for exigency justifying the resulting warrantless search or seizure of the suspect in his or her home.

Here, however, the facts fail to show that Officer Scott was in hot pursuit of Dugan. She was not chasing Dugan in an effort to immediately stop and apprehend him. Rather, Officer Scott began following the black SUV to ascertain that she, in fact, had found the vehicle involved in the hit-and-run. To that point, Officer Scott had not seen any damage to the SUV consistent with a collision and had not gotten close enough to compare the tag to the information relayed from the dispatcher. Officer Scott, therefore, had chosen not to engage the emergency equipment on her patrol car in an attempt to stop the SUV. Nor had she otherwise indicated to Dugan in some fashion that he needed to pull over. In short, Officer Scott was not so much chasing Dugan as following him. Her actions were more aptly described as a rolling surveillance than a hot pursuit. At the suppression hearing, Scott testified that she believed the SUV sped up at some point. But Scott agreed that she did not know how fast the SUV was going and never cited Dugan for exceeding the speed limit. Nothing reasonably would have suggested to Dugan that a law enforcement officer was trying to stop him. Nobody was.

Scott first activated the emergency equipment on her patrol car when Dugan pulled the SUV into the garage of his house. Until then, she had not confirmed the tag number and had not concluded she had the SUV involved in the hit-and-run. Officer Scott did not give Dugan an oral command to stop or tell him he was under arrest. The record evidence indicates the garage door had begun to come down. But that is not a determinative fact regarding hot pursuit. The evidence fails to support a chase or some concerted effort on Dugan's part to evade an arrest begun in a public place. That is determinative and undermines the State's contention.

As soon as Dugan entered the garage he was within a constitutionally protected part of the house. *Coffin v. Brandau*, 642 F.3d 999, 1011-13 (4th Cir. 2011); *United States v. Oaxaca*, 233 F.3d 1154, 1157 (9th Cir. 2000) (An attached "garage is as much a part of his castle as the rest of his home" and, thus, protected by the Fourth Amendment) (cases cited); *State v. Blair*, 31 Kan. App. 2d

202, 206, 62 P.3d 661 (2002); see *Taylor v. United States*, 286 U.S. 1, 5, 52 S. Ct. 466, 76 L. Ed. 951 (1932) (warrantless search of garage adjacent to home in urban area violated Fourth Amendment). And there could have been no hot pursuit—even an abbreviated one of the type in *Santana*—as Dugan closed the garage door, whether or not he was then aware of Scott's presence. His lowering of the garage door was the constitutional equivalent of simply shutting the front door from the inside of the house, an action insufficient to establish hot pursuit. Hot pursuit depends upon movement from a location unprotected by the Fourth Amendment to a protected location in a deliberate effort to evade arrest. *People v. Davis*, 398 Ill. App. 3d 940, 952, 924 N.E.2d 67 (2010) (no hot pursuit when suspect opened door to apartment and retreated further inside); see *United States v. Jones*, 565 U.S. \_\_\_, 132 S. Ct. 945, 951-53, 181 L. Ed. 2d 911 (2012) (Although the Fourth Amendment has been described as protecting a person's reasonable expectations of privacy rather than particular places, those expectations are shaped by and ultimately augment traditional property law concepts, such as trespass, with respect to protected areas enumerated in the Amendment's text, including the home.); *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998); 525 U.S. at 97-98 & n.3 (Scalia, J., concurring). In sum, the record here does not support the sort of circumstances depicting hot pursuit; the district court, therefore, erred in considering that exception to the warrant requirement. If anything, Officer Scott's action in sticking her foot beneath the garage door to keep it from closing was itself a Fourth Amendment violation rather than evidence of an exception to the warrant requirement. Courts have regularly found that a law enforcement officer may violate the Fourth Amendment by making concerted efforts to prevent a person from closing the door to his or her residence to end their contact. *State v. Hudson*, 147 Idaho 335, 337, 209 P.3d 196 (Idaho App. 2009) ("[T]he first officer unlawfully entered Hudson's motel room when he stopped the door from closing with his foot and then pushed it open so he could continue to observe Hudson," who he suspected of possessing marijuana.); *State v. Johnson*, 173 Ohio App. 3d 669, 673, 880 N.E.2d 111

(2007); *State v. Larson*, 266 Wis. 2d 236, 244-45, 668 N.W.2d 338 (Wis. App. 2003) (A police officer violates the Fourth Amendment when, without a warrant, he or she steps across the threshold of an apartment preventing the resident from closing the front door.).

## B. *Any Hot Pursuit Would Not Have Created Exigency*

Even if Officer Scott had been in hot pursuit of Dugan, that alone would not have furnished an absolute exception to the warrant requirement, at least when, as here, the pursuit stemmed from a comparatively minor offense without aggravating circumstances implicating broader law enforcement or safety concerns. *Welsh*, 466 U.S. at 751-53 (citing with favor appellate cases that "have looked to the nature of the underlying offense as an important factor to be considered in the exigent-circumstance calculus" and so holding); *Mascorro*, 656 F.3d at 1206, 1209 (noting importance of offense in determining exigency of hot pursuit); 656 F.3d at 1209 (neither United States Supreme Court nor the Tenth Circuit has held that hot pursuit of a misdemeanant amounts to an exigent circumstance without some additional justification for dispensing with warrant requirement); *Schmidt*, 403 F.3d at 1013 (not all police pursuits create exigent circumstances dispensing with warrant requirement of Fourth Amendment, noting seriousness of underlying offense a factor). Hot pursuit simply presents one type of exigent circumstance to be evaluated as any other exigent circumstance might be—by looking at all of the relevant facts. See *Thomas*, 280 Kan. at 537-38 (The court reviews "important" case-specific facts in determining law enforcement officers were legally justified in relying on hot pursuit of an individual for whom they had a felony arrest warrant when he ignored their command to stop and entered a third-party's home.); *Mascorro*, 656 F.3d at 1206-07 (applying *Platten*-like factors to evaluate exigency of hot pursuit); *Plavcak*, 411 F.3d at 663 (enumerating common types of exigency, including hot pursuit, and noting they must be assessed based on the totality of the circumstances); *Schmidt*, 403 F.3d at 1014-15 (court reviews circumstances surrounding hot pursuit, not simply its existence, to find exigent circumstances); *United States v. Wihbey*, 75 F.3d 761, 766 (1st Cir. 1996) (same). As the Kansas

Supreme Court has stated: "This court has . . . recognized that hot pursuit is one example of an exigent circumstance." *Thomas*, 280 Kan. at 537. Commonly, commission of a misdemeanor offense itself fails to provide sufficiently exigent circumstances to permit a warrantless intrusion into the suspect's home. *Welsh*, 466 U.S. at 750 ("When the government's interest is only to arrest for a minor offense, . . . the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by neutral and detached magistrate."); *Struckman*, 603 F.3d at 745; *United States v. Johnson*, 256 F.3d 895, 908 n.6 (9th Cir. 2001) (When an officer is in hot pursuit of a suspected felon, the Fourth Amendment "usually yields" to the exigency; but when the offense is a misdemeanor, "law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases.") (citing *Santana*, 427 U.S. at 42-42; *Welsh*, 466 U.S. at 753). In other words, hot pursuit does not hand law enforcement officers an automatic or per se exemption from the constraints of the Fourth Amendment.

The State relies, in part, on a sentence lifted from *Thomas*, 280 Kan. at 536, in which the Kansas Supreme Court cites *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990), as supporting the proposition: "The United States Supreme Court has recognized that hot pursuit alone justifies a warrantless intrusion into a home." The United States Supreme Court actually suggested the Minnesota Supreme Court had "applied essentially the correct standard" in "observ[ing] that 'a warrantless intrusion may be justified by hot pursuit of a fleeing felon' " or other exigent circumstances. 495 U.S. at 100 (quoting *State v. Olson*, 436 N.W.2d 92, 97 [Minn. 1989]). The State's implication drawn from the paraphrase in *Thomas* to the effect hot pursuit, as an exigency, need not be evaluated based on the totality of the circumstances in a given case deviates from the cited language in *Olson* and from other Fourth Amendment authority. In *Olson*, the Minnesota prosecutor principally argued that Olson lacked standing because he was seized in a duplex where he was an overnight guest and alternatively argued exigent circumstances excused the need for a warrant. The prosecutor did not attempt to further categorize the exigency, but the facts do not depict hot pursuit or a police chase.

See *Olson*, 436 N.W.2d at 93-94, 97. In that case, the United States Supreme Court neither recognized hot pursuit as an unlimited exception to the Fourth Amendment nor otherwise cleaved it from the exigent circumstances doctrine to be applied based on the totality of the facts in a given case. And the United States Supreme Court has not done so since. The State's implication is also contrary to the *Thomas* court's consideration of additional circumstances bearing on the reasonableness of the entry and search in that case. See *Thomas*, 280 Kan. at 537-38.

Turning to the circumstances of this case and assuming Officer Scott actually was in hot pursuit of Dugan, we look at all of the relevant facts to determine if the police officers acted in conformity with the Fourth Amendment. The nonexclusive list of factors set out in *State v. Platten*, 225 Kan. 764, 770, 594 P.2d 201 (1979), provides a useful starting point. But, as the Kansas Supreme Court indicated in *Thomas*, 280 Kan. at 534-36, not all of those factors need be present, and those that are need not point one way. Other circumstances may also bear on the sufficiency of the exigency. The *Platten* factors are:

"(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) strong reasons to believe that the suspect is in the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended and (6) the peaceful circumstances of the entry. It is also recognized that the possible loss or destruction of evidence is a factor to be considered." *Platten*, 225 Kan. at 770.

The factors are not to be applied as a scorecard with checkmarks for the government and the defendant and then tallied to declare a winner. Rather, they depict areas worthy of consideration in making an integrated analysis of the relevant factual circumstances. See *United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (en banc) (describing substantially those same factors "as an illustrative sampling of the kinds of facts to be taken into account"). The analysis is guided by what a reasonable law enforcement officer would have understood from the circumstances at the time of the challenged intrusion. *Brigham City*, 547 U.S. at 404; *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011); *United States*

*v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) (To determine if the government has adequately shown exigent circumstances, the courts " 'evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers.' " [quoting *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998)]). It is not undertaken from an after-the-fact perspective looking at information that came to light as a product of the search or seizure or otherwise during any later investigation. See *Reeves*, 524 F.3d at 1170.

We first consider the gravity and violent nature of the offense. We do so based on the traffic offense as reported to Officer Scott before she entered Dugan's residence. Although Dugan was eventually charged with leaving the scene of a noninjury accident in violation of K.S.A. 8-1603, punished as an unclassified misdemeanor with a maximum sentence of a month in jail for a first offense, that is irrelevant. Scott understood the offense to be leaving the scene of an injury accident in violation of K.S.A. 8-1602 or the comparable ordinance. Leaving the scene of an injury accident is a Class A misdemeanor punishable by up to 1 year in jail. As provided in K.S.A. 8-1602, leaving the scene of an accident causing great bodily harm or death is a felony. Scott testified the offense was communicated to her as one involving an injury consistent with the misdemeanor violation. She did not indicate in any way she understood or considered the offense as involving great bodily harm or death and, thus, a felony.

Class A misdemeanors, by penalty, are the most serious nonfelony offenses in the Kansas traffic and criminal codes. But the gulf between even serious misdemeanors and lesser felonies historically has been a wide one, and that remains true. Misdemeanors typically entail shorter sentences, although that is not invariably the case, to be served in local jails rather than state penitentiaries. Felony convictions usually entail longer terms of probation or postrelease supervision. They may also preclude licensure in certain professions or trades. And felony convictions strip offenders of significant public and civil rights, including holding public office, voting, serving on juries, and possessing firearms. See K.S.A. 21-4516; 18 U.S.C. § 922(g)(1) (2006). As a group, misdemeanors lack the

gravity of felonies. As a broad generalization, a suspected misdemeanor violation, particularly a traffic offense, would be less likely to justify law enforcement officers making a warrantless intrusion into a suspect's residence. While leaving the scene of an accident reflects a degree of deliberateness uncharacteristic of most traffic violations, that does not distinguish it from the run of misdemeanors requiring at least general criminal intent. The calculus of exigency, however, could change some if the misdemeanor involved violence or threats of violence, as might battery, criminal restraint, or simple assault. Here, the offense—leaving the scene of an accident—does not suggest or reflect violence. Nothing in the record evidence otherwise imputes any sort of violent behavior to Dugan. He did not, for example, deliberately collide with the other vehicle or threaten harm to the other driver.

As the caselaw suggests, hot pursuit of a suspected felon tilts strongly toward an exigency supporting warrantless entry into the suspect's residence. *Olson*, 495 U.S. at 100; *Johnson*, 256 F.3d at 908 n.6. We do not venture into that arena or the application of the doctrine to myriad felonies ranging from murder and rape to expensive shoplifting. Those cases would present markedly different facts across their range and in comparison to this case in assessing the constitutionality of purported exigencies obviating the need for a warrant.

Before moving on, however, we mention that at the suppression hearing, Officer Scott testified that she recalled some radio traffic indicating that Dugan may have been drinking. But her written report contains no information to that effect. And it was pointed out that she testified otherwise at the preliminary hearing. At the suppression hearing, Officer Scott testified she did not see Dugan drive erratically or unlawfully. In making findings of fact in its written ruling denying the motion to suppress, the district court concluded that based on "the radio calls," Officer Scott "learned that a large man driving a dark colored Ford Expedition with Kansas tag number [******] struck another vehicle from behind injuring the driver of the other car and then left the scene of the accident." The district court also found the dispatcher communicated Dugan's name and address as the owner of the SUV. The district

court, however, made no finding that Officer Scott received any information to the effect Dugan may have been drinking. Accordingly, consistent with those factual findings, we premise our analysis on the absence of such information.

The second *Platten* factor, inquiring whether the suspect reasonably might be considered armed, links to the first and addresses potential danger in delaying interdiction. A suspect brandishing or carrying a weapon, particularly a firearm, poses an increased threat to law enforcement officers and members of the public—a recognized category of exigent circumstances. In this case, however, Dugan neither was armed nor otherwise appeared to pose any special risk or danger. The factor would not, therefore, escalate the exigency of the hot pursuit or of the overall circumstances.

The next factor looks at the strength of the probable cause. As we have indicated, Officer Scott had probable cause to arrest and for a search warrant upon matching the tag on Dugan's SUV to the one reported from the scene of the accident, especially coupled with the vehicle turning into the driveway at the address associated with Dugan. But just how "a clear showing" of probable cause should be assessed in measuring the exigency of the circumstances for a warrantless entry is not so clear. As the cases establish, law enforcement officers must have probable cause independent of and in addition to any exigent circumstance to effect a warrantless entry of a suspect's residence. Probable cause is not measured on a sliding scale; either it exists based on a given set of facts or it doesn't. Assuming the government agents have significantly more than probable cause implicating the suspect in a particular crime, that neither increases nor diminishes the urgency of intervening without obtaining a warrant. Even if the agents correctly thought they had proof beyond a reasonable doubt pointing to the suspect, they could not bypass getting a warrant from a judge for that reason alone. And they could not for that reason alone enter the suspect's home to arrest him or to search for evidence to convict him. Absent an exigency making time of the essence, law enforcement officers must adhere to the Fourth Amendment and obtain a warrant from a judge no matter how strong their evidence. Here, the factor plainly favors the government however measured or applied.

The next factor looks at the strength of the circumstances indicating the suspect is actually on the premises to be entered without a warrant. In this case, that evidence was obvious and irrefutable.

The fifth factor considers the likelihood the suspect may escape if not immediately taken into custody. The record evidence at the suppression hearing really did not directly pertain to that factor. The considerations are akin to those bearing on hot pursuit in that both deal with the suspect's attempting to evade law enforcement officers in some fashion. We suppose Dugan's residence had a front door and a rear door, along with access through the garage. He could have attempted to escape through those points. We also understand that at least one additional officer arrived to help Officer Scott. Those officers, perhaps assisted by one more, could have watched for any escape attempt while another officer or prosecutor got an arrest warrant or a search warrant. It was early afternoon, so Dugan could not have slipped away under the cover of darkness. Had Dugan left his home in an effort to escape or for some other reason, the officers could have attempted to stop and question him, as provided in K.S.A. 22-2402(1). If he ignored them and continued to leave the area, the officers would have had probable cause to arrest him for unlawful interference under K.S.A. 21-3808(a). If he did stop, the officers presumably would have discovered he had been drinking and could have arrested him for DUI, since he then would have been in a public place and no warrant would have been required. See K.S.A. 22-2401(c)(2)(A) (officers may arrest for a misdemeanor based on probable cause and loss of evidence). The officers already had identified Dugan and determined where he lived. So if he had escaped, they knew who they were looking for and had a good idea where he would turn up eventually. Escape does not loom large in this case.

Finally, *Platten* looks at "the peaceful circumstances of the entry." 225 Kan. at 770. The facts here are mixed. The Lawrence Police Department obviously did not get out the battering ram and intervention team to enter Dugan's house. And Officer Scott did not go in with her service weapon drawn. But Officer Scott actively and aggressively intervened to prevent the garage door from closing and, thus, forcibly entered Dugan's home. That cannot be con-

sidered peaceful in a pure sense, although the entry was not as intimidating as it might have been, and it wasn't physically destructive. See *United States v. Martin*, 613 F.3d 1295, 1304 (10th Cir. 2010) (officers neither forced their way into residence nor drew their weapons weighing in favor of reasonableness of warrantless entry especially when they properly believed suspect to be armed and dangerous). Nothing in the record suggests circumstances beyond those accounted for in the *Platten* factors that would support exigency.

Had Officer Scott allowed the garage door to close, she still could have knocked on the front door and sought Dugan's consent to speak with him and to search either his home or his SUV. Officer Scott testified at the suppression hearing that based on her experience "once the garage door closes people don't tend to answer the door." She explained that she tripped the sensor to prevent the garage door from closing because "I was fearful that he was not going to open the door." If that happened, Officer Scott and her colleagues would have had to wait while the prosecutor or a police department representative secured a warrant from a judge. In short, things would have become measurably less efficient. But governmental efficiency is not the same as exigency. And the Fourth Amendment does not yield to the impatience of law enforcement officers.

Consistent with reviewing the totality of the circumstances, we defer our determination until we have also considered the potential loss of evidence.

## C. *Potential Loss of Evidence Did Not Create Exigency*

In *Platten*, 225 Kan. at 770, after outlining the factors bearing on exigent circumstances, the Kansas Supreme Court notes that the possible loss of evidence may be taken into account. As the law has developed, loss of evidence has come to be treated as a type of exigent circumstance rather than simply a factor to be considered. The State relies on the loss of evidence as an exigency independently justifying the warrantless entry of Dugan's residence. Whether loss of evidence is labeled a factor or an exigent circumstance amounts to semantics, since the ultimate determination of

the constitutional propriety of a warrantless entry depends upon a seamless analysis of all of the material facts. We, therefore, turn to the potential loss of evidence.

To qualify as an exigency, the potential loss of evidence—be it through destruction, concealment, or removal—must present an imminent threat rather than a mere possibility. *Mell*, 39 Kan. App. 2d at 482. The courts consider various circumstances in determining exigency, including: (1) the time needed to secure a search warrant; (2) the reasonableness of the officers' belief the evidence may be immediately lost; (3) potential danger to the officers guarding the site while awaiting a warrant; (4) whether those persons with possession of the evidence are aware of the officers' presence; and (5) the ease with which the evidence might be destroyed or hidden. *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008); *United States v. Vega*, 221 F.3d 789, 800 (5th Cir. 2000) (same). The facts developed at the suppression hearing do not advance the State's position that loss of evidence either alone or in conjunction with the pursuit amount to a constitutionally sufficient exigency.

The prosecution presented no evidence about the time likely needed to obtain a warrant or any special obstacles in doing so in this case. Officer Scott did not testify that she believed evidence would be lost if she and her colleagues waited to get a warrant. As we have discussed earlier, Dugan presented no particular danger to the officers or the public. Dugan, however, was aware of Officer Scott's presence. Evidence related to the leaving-the-scene charge presumably would have entailed damage to the SUV consistent with the collision and transfer of paint or other trace materials from the other vehicle. Repairing collision damage likely would have been time consuming work. Depending on the degree of damage, Dugan might have required replacement parts or specialized equipment used in body shops. Dugan presumably would have a somewhat easier time removing any transferred paint. The suppression hearing record is silent on those considerations. But the loss of evidence plainly would not have been so easily accomplished as the drug trafficker flushing contraband down the toilet. If officers waiting for a search warrant had heard sounds coming from the garage consistent with Dugan attempting to fix his SUV, they

might well have had sufficient exigent circumstances at that point to immediately enter the premises. See *Hendrix*, 664 F.3d at 1339 ("officers were justified in believing the commotion in the motel room indicated its occupants were attempting to destroy evidence," thereby creating an exigent circumstance for a warrantless entry); *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008).

We find insufficient support for the immediate destruction of evidence as an exigent circumstance or as factor to be considered in otherwise determining exigency.

In its written ruling denying the motion to suppress, the district court suggested that if Dugan were under the influence of alcohol, evidence in the form of a reliable breath test or other indicators of intoxication could be lost or compromised while the officers waited for a judge to sign a warrant. That would be true. But, as we have pointed out, exigent circumstances must be based on what a reasonable law enforcement officer would conclude from the information available at the time of the entry. The district court effectively found no information had been provided to Officer Scott indicating Dugan had been drinking, and Officer Scott made no firsthand observations supporting that conclusion. Accordingly, Officer Scott's warrantless entry could not have been based on any reasonable belief that evidence of intoxication would otherwise be lost. The district court could not properly rely on that sort of hypothecated circumstance to deny the motion to suppress. Again, we venture no speculation on whether preservation of evidence of alcohol consumption in a routine DUI case would create a constitutionally sufficient exigency to permit law enforcement officers to enter the suspect's residence without a warrant. See *State v. Legg*, 633 N.W.2d 763, 772 (Iowa 2001) (loss or compromise of blood alcohol evidence in DUI supports finding of exigency); but see *Larson*, 266 Wis. 2d at 251 (loss of blood alcohol evidence in DUI not exigency). Those circumstances are not the circumstances of this case.

## IV. CONCLUSION

In reviewing the totality of the circumstances, we find the district court erred in denying the motion to suppress. There were no

exigent circumstances permitting a warrantless entry into Dugan's home. Officer Scott did not engage in a "hot pursuit" of Dugan as that term embodies an exigency dispensing with the warrant requirement of the Fourth Amendment. Even if there were such a pursuit, the facts do not outline the sort of immediacy and urgency that would excuse obtaining a warrant. Although probable cause had been well established, the offense was comparatively minor. Inside his home, Dugan posed no danger to the officers or others. He presented no realistic threat of escape. Officer Scott acted aggressively to achieve entry to the residence as the garage door closed, and she did so not because of a genuine exigency but to avoid resorting to investigative methods that might be ineffective—trying to get Dugan's consent—or that would be time consuming—securing a warrant from a judge.

A citizen's Fourth Amendment rights do not rise or fall on the schedules of government agents or their predilections for expediency. The framers intended judicially issued warrants as a check on just those inclinations and to preserve for the citizenry a sphere of privacy in their own homes against undue government intrusion. The Fourth Amendment has not yet fallen into such disrepair that it no longer serves that fundamental purpose in a case such as this.

The ruling of the district court denying Dugan's motion to suppress is reversed, and the case is remanded with directions that the motion be granted.