No. 116,888

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KENNY and SHARON ALLEN,
*Appellants*,

v.

MARYSVILLE MUTUAL INSURANCE CO.,
*Appellee.*

SYLLABUS BY THE COURT

1.

An appellate court applies the same standard as the trial court in reviewing the grant of a summary-judgment motion. Summary judgment is proper only when the motion, together with the evidence submitted by the parties, shows that there is no genuine issue as to any significant fact and the moving party is entitled to judgment as a matter of law.

2.

In this case, law-enforcement officers confronted an armed and dangerous suspect, holed up in someone else's residence, after a two-state police chase. The officers had legal authority to enter the residence, arrest the suspect, and search for evidence without a warrant, but the officers obtained a search warrant, anyway, as a prudent step to protect the ability to use evidence in a later criminal case against the suspect. In the course of arresting the suspect, officers caused substantial damage to the home. On these facts, an exclusion in the homeowners' insurance policy for "a loss which results from order of

civil authority" did not apply because the damages did not result from the issuance of the search warrant.

3.

In this case, conflicting hearsay evidence was presented on a factual issue necessary to determine whether the loss was covered by the homeowners' insurance policy. Accordingly, summary judgment cannot be granted on the coverage issue.

Appeal from Montgomery District Court; F. WILLIAM CULLINS, judge. Opinion filed October 20, 2017. Reversed and remanded.

*W.J. Fitzpatrick*, of Fitzpatrick & Bass, of Independence, for appellants.

*Norman R. Kelly* and *Charles Ault-Duell*, of Norton, Wasserman, Jones & Kelly, L.L.C., of Salina, for appellee.

Before ARNOLD-BURGER, C.J., LEBEN and BURGESS, JJ.

LEBEN, J.: Kenny and Sharon Allen owned a rental home in rural Montgomery County, near the small town of Liberty, between Coffeyville and Independence. Brian and Lori Reedy rented the home.

While the Reedys were out, a two-state police chase ended near their home. It ended when a local sheriff's deputy managed to stop the last of three people who had been fleeing police in a chase in which shots had been fired at police officers and one had been hit. When stopped in this rural area, the man began another gunfight with police, and a civilian he'd taken hostage in a carjacking during the chase was shot. The man fled the gunfight on foot, ending up at the Reedy residence. According to the Allens, he then broke a window to gain entry to the garage and, ultimately, the residence.

2

Not surprisingly, law-enforcement officers quickly surrounded the house, but their calls for the suspect to come out and surrender got no response. Eventually, the officers decided the safest approach would be to fill the home with tear gas and pepper spray in an effort to limit the areas of the home the suspect could be in and to degrade his ability to respond aggressively when officers eventually came in. So officers shot what may have been 15 canisters at the house, most breaking through windows and then delivering their intended payload upon hitting some object (often a sheetrock wall) in the house.

Their strategy worked. When officers ultimately broke through a door, they found the suspect hiding under a mattress in a closet, apparently doing his best to avoid the chemicals that would have been irritating his eyes and causing difficulty breathing. He was taken into custody without further gunshots or injury.

Unfortunately, the damage to the house from all of this was extensive. Repair estimates ranged from $34,000 to $36,000, while the house was insured for $32,000. In the Allens' view, it's a total loss.

So the Allens filed a claim with their property-insurance carrier, Marysville Mutual Insurance Company. Marysville Mutual said that the loss was totally excluded from coverage by a policy provision that excluded coverage for "a loss which results from order of civil authority," even if there were other causes for the loss that would have been covered under the policy.

Marysville Mutual argues that the search warrant officers got from a local judge while they were waiting to enter the home constitutes an "order of civil authority" and that the officers entered under that authority. The district court granted summary judgment in favor of Marysville Mutual based on that policy exclusion.

But we think Marysville Mutual's argument overlooks some key words in that exclusion—the loss must *result from* the order of civil authority. Here, the officers didn't need a search warrant to go into the residence. A warrant wouldn't have been required to apprehend this man who posed a clear threat to the local community and, officers had good reason to believe, had committed attempted murder and other crimes on his way there. Nor would a warrant have been required to enter the house to gather evidence since both the property owners, the Allens, and the residents, the Reedys, had given officers permission to go in. So the damage to the house was caused not by the issuance of a search warrant but by the appropriate and foreseeable actions taken by law-enforcement officers after a dangerous fugitive took refuge in a private home and refused to surrender.

If the Allens are correct that the man entered the home by breaking a window, an act of vandalism, then the damage to the house would be a covered loss: Losses caused by vandalism are covered under the policy, and the damages here were a foreseeable result of the fugitive's act of breaking into the home. But Marysville Mutual presented other evidence suggesting that the man entered through an unlocked door. Accordingly, summary judgment cannot be granted to either side given the conflicting evidence. We reverse the district court's grant of summary judgment to Marysville Mutual and return the case to the district court for further proceedings.

With that overview, we will proceed to more fully set out the factual background, the legal arguments, and our ruling.

FACTUAL AND PROCEDURAL BACKGROUND

Each side filed a summary-judgment motion in the district court, and we take our facts from the evidentiary materials provided with those motions. Most of the key facts are not in dispute.

4

The story begins on a Thursday afternoon in May 2015 in Nowata County, Oklahoma, which sits on the Kansas-Oklahoma border directly south of Montgomery County, Kansas. Oklahoma officers stopped a Chevy Tahoe occupied by two men and a woman. After the officer asked for some paperwork, he told the driver to shut off the car. Instead, the driver sped off.

Someone in the Tahoe fired at officers, hitting one in the head. Officers pursued as the Tahoe headed toward Coffeyville, Kansas. Montgomery County sheriff's deputies then joined in. They used spiked "stop sticks" to puncture the tires on the Tahoe, and it ended up disabled and in a ditch, where the three occupants fled on foot into a wooded area.

Two of the three were quickly captured; one man had been shot in the exchange of gunfire and the woman stayed with him. The third person, Alejandro Garcia, armed with a weapon, managed to car-jack another vehicle—taking the driver hostage—and keep going. A sheriff's deputy ultimately stopped that car, and the person who had been driving the car-jacked vehicle was hit in the neck during another exchange of gunfire. Garcia got out of the vehicle, fired at officers, and headed for the nearby Reedy residence—the house owned by the Allens. No one was home.

According to the Allens, Garcia broke a window in the garage, dove through it, and then entered the house from the garage through an unlocked interior door. Marysville Mutual says Garcia denied that, later telling police he came in through an unlocked door. Either way, what would become a 14-hour standoff with police had begun.

Local officers quickly secured the area. They used loudspeakers to order Garcia to come out and surrender; he didn't. Eventually, officers from the Kansas Bureau of Investigation's "High Risk Warrant Team" arrived to help out.

Also present at the scene were the Allens and the Reedys. They gave their consent to search the home and offered keys to the residence to officers. But with all that Garcia had already done that day, the officers couldn't safely just approach the house, put a key in the lock, and walk in. The Reedys also advised police that they kept several firearms and ammunition in the home.

The law-enforcement team decided to use chemical munitions—tear gas and pepper spray—to attempt to drive Garcia out of the house. These chemical agents generally cause significant burning and watering of the eyes, a stinging or burning sensation in the nose, tightness and pain in the chest, and difficulty breathing. So even if tear gas and pepper spray didn't force Garcia outside, Garcia's exposure to the chemicals would limit his ability to move around the house and to aggressively engage the police.

As the night progressed, officers made another decision. They contacted a local judge for a search warrant. In an affidavit, an officer set out facts showing why they suspected that Garcia, holed up in the Reedy residence, had committed attempted first-degree murder in the shooting of an Oklahoma officer. The judge issued a search warrant for the Reedy residence, authorizing agents to collect "[t]he person of Alejandro Garcia," biological evidence, firearms, and electronic evidence.

After the search warrant was issued, officers used 40-millimeter munitions launchers to send canisters hurtling at high speed through glass windows, breaking through the windows before being stopped by interior objects like sheetrock walls. As the canisters collided with interior objects, they released the tear gas and pepper spray. Notes made by law-enforcement personnel indicated that as many as 15 gas canisters may have been shot into the house. In addition to achieving the intended purpose of making life hard on Garcia, this also resulted in broken glass, damaged siding, damaged sheetrock, chemical absorption into carpets, chemical stains, and other damage to personal property.

About an hour after deploying the tear gas and pepper spray, officers entered the house by breaking through a glass patio door. They found Garcia under a mattress in a closet and took him into custody without further violence.

The Allens got two repair estimates, which were in the range of $34,000 to $36,000. They had insured the property for $32,000. With the loss apparently greater than the property's insured value, the Allens made claim on their property-insurance carrier, Marysville Mutual. When Marysville Mutual denied the claim, the Allens sued.

Each side presented a summary-judgment motion to the district court. The district court concluded that coverage was excluded by a provision saying that Marysville Mutual would "not pay for loss which results from order of civil authority." The court granted summary judgment to Marysville Mutual, and the Allens appealed to our court.

ANALYSIS

On appeal from the grant of summary judgment, we apply the same standard the trial court is required to apply. Summary judgment is proper only when the motion, together with the evidence submitted by the parties, shows that there is no genuine issue as to any significant fact and the moving party is entitled to judgment as a matter of law. *St. Catherine Hospital v. Alvarez*, 53 Kan. App. 2d 125, 127, 383 P.3d 184 (2016). We are also aware of the rules for interpreting insurance contracts, see *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 707, 317 P.3d 70 (2014), but we do not rely upon them because we find no ambiguity in the pivotal provision of the insurance contract at issue here.

In their summary-judgment motion, the Allens contended that the property damage was caused by Garcia's act of breaking and entering the residence. According to the Allens, Garcia's break-in triggered the policy's coverage for vandalism. Assuming

7

Garcia broke a window to gain entry, he committed vandalism. The Allens then argued that Garcia's break-in was the first in a series of event that resulted in the home's damage—and that the remaining steps were easily foreseeable. Thus, they argue that the vandalism, a covered event, was the "efficient proximate cause" of the loss and the loss is therefore covered by the policy. By calling the vandalism the efficient or proximate cause, the Allens are simply saying that it was sufficiently connected to the result that the law should recognize the vandalism as the cause of the damage.

As the Allens suggest, Kansas has applied a proximate cause or efficient cause rule to determine whether a loss is covered under an insurance contract. See *Casualty Co. v. Power Co.*, 99 Kan. 563, 565, 162 P. 313 (1917); Jerry & Richmond, *Understanding Insurance Law* 534-39 (5th ed. 2012). The Allens note that under typical Kansas law for determining when something is the proximate, or legal, cause, when the actions of one party lead to loss through additional but foreseeable actions of other parties, the first party's act remains the proximate cause of the injury. In support, they cite *Steele v. Rapp*, 183 Kan. 371, 377, 327 P.2d 1053 (1958).

Marysville Mutual begins its argument with the policy exclusions, not the coverage sections. It points to an exclusion for any "loss which results from order of civil authority." The policy also included a provision that the insurer would "not pay for loss if one or more of the . . . exclusions apply . . . regardless of other causes or events that contribute to or aggravate the loss." In other words, if there is more than one cause of the damage—also known as concurrent causes—and *one* of the causes of the loss is excluded, the insurer doesn't pay for the loss.

Based on these provisions, Marysville Mutual's summary-judgment motion said the issue to be decided was "whether the damage to Plaintiffs' rental residence resulted from the lawful, reasonable execution of orders issued by duly-authorized government authorities." Marysville Mutual then argued that "[a] search warrant like the one executed

[here] is a government order," thus meeting the terms of the policy exclusion. In support of this argument, Marysville Mutual relied primarily on two cases in which similar policy exclusions were held to apply to damages caused by the execution of a search warrant, *Kao v. Markel Ins. Co.*, 708 F. Supp. 2d 472 (E.D. Pa. 2010), and *Alton v. Manufacturers & Merchants Mutual Ins. Co.* 416 Mass. 611, 624 N.E.2d 545 (1993). The district court relied on those cases in granting Marysville Mutual's motion.

We will start with the insurance company's argument about the policy exclusion because if it applies, that may end the case, as the district court ruled. That's because the insurance contract here also provides that if there is more than one cause contributing to a loss (in other words, if there are concurrent causes), coverage is totally excluded if at least one of the causes—however minor—is excluded. By way of example, Marysville Mutual suggested in oral argument to our court that had the officers destroyed only the lock on the front door to get into the house, while Garcia had committed vandalism to destroy the rest of the house, there would be no coverage because part of the loss would have been caused by an excluded event. The Allens argue that this provision about concurrent causes should be void as against public policy. But we need not consider that argument unless the order-of-civil-authority exclusion applies. We find that it does not.

The problem with Marysville Mutual's argument is a simple one. The insurance-coverage exclusion applies only if the loss "results from order of civil authority." "Results from" at a minimum sets out a requirement of actual causation. See *Burrage v. United States*, 571 U.S. ___, 134 S. Ct. 881, 887-89, 187 L. Ed. 2d 715 (2014); *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 437, 153 P.3d 550 (2007). And there's simply no cause-and-effect relationship between the actions officers took to get Garcia out of the house and the issuance (or execution) of the search warrant: Officers didn't need a warrant to enter the house, arrest Garcia, and collect evidence.

Officers had ample cause—and certainly the required "probable cause" needed to arrest someone—to believe Garcia had committed attempted murder (among other crimes) shortly before he holed up in the Reedys' home. That gave officers authority to arrest him. K.S.A. 22-2401(c). And when officers have arrest authority, they may, subject only to constitutional limits, use "[a]ll necessary and reasonable force . . . to effect an entry upon any building or property" to make the arrest. K.S.A. 22-2405(3). Faced with an armed man who had led police on a two-state chase while firing at officers and then had sought refuge in someone else's residence, entering that house to arrest Garcia would not have violated the Fourth Amendment's protection from unreasonable search and seizure, either. See *Warden v. Hayden*, 387 U.S. 294, 298-300, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967); *State v. Dugan*, 47 Kan. App. 2d 582, 592, 276 P.3d 819 (2012). Marysville Mutual set out extensive factual support for the proposition that Garcia posed a clear threat to the local community, including the report of its expert witness, retired Salina police officer James Norton. Norton explained that officers had to worry about the risk that Garcia could escape as well as the risk to officers who sought to apprehend him. In these circumstances, officers had ample authority to enter the home to arrest Garcia.

Nor did officers need a warrant to search the home for evidence. According to Kenny Allen, in testimony not contradicted in our record, both the Allens and the Reedys had offered their keys to the home to allow police to get in. And Officer Norton reports that the Allens and the Reedys had consented to a search of the home. Consent of the owners and renters would certainly suffice; as an uninvited trespasser fleeing from police, Garcia had no reasonable expectation of privacy there. See *United States v. Matlock*, 415 U.S. 164, 169-70, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) (noting ability of joint occupant of a residence to consent to search); *Rakas v. Illinois*, 439 U.S. 128, 141, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) (noting that "one wrongfully on the premises could not move to suppress evidence obtained as a result of searching them"); *State v. Cruz*, 15 Kan. App. 2d 476, 481, 809 P.2d 1233 (1991) ("Trespassers have not been granted Fourth

10

Amendment rights because they do not have a reasonable expectation of privacy in the property.").

We do not suggest that officers acted unwisely when they sought a search warrant. By doing so, they eliminated a motion that Garcia could have filed in the criminal case arguing that a warrant was required and an evidentiary hearing at which the State would have had to show factually why no warrant was required. But on the facts presented to the district court on the summary-judgment motions in our case, it's clear that no warrant was needed either to arrest Garcia or to search the house.

So what took place here was that—although police could have gone in without a warrant—they got one, anyway, as a prudent measure to protect the ability to use whatever evidence might be collected in a criminal case against Garcia. The damage caused to the house by the actions the officers took to subdue and arrest Garcia had nothing to do with the search warrant. And we see no reason why the officers' prudent actions to protect the ability to use evidence in a criminal case against Garcia should have any impact on the coverage provided by the Allens' property-insurance carrier.

Neither of the key cases relied upon by Marysville Mutual and the district court is similar to our case. Neither *Kao* nor *Alton* involved the arrest of a fleeing fugitive; rather, both cases simply involved execution of search warrants allowing officers to look for illegal drugs. In those cases, officers caused damage to doors or objects in the premises (such as paneling and lights) where officers apparently searched for drugs. *Kao*, 708 F. Supp. 2d at 475; *Alton*, 416 Mass. at 612 n.1;. Thus, the damage in those cases *did* result from execution of the search warrants. That's simply not the case here.

One might suggest that the exclusion still could apply by treating the senior law-enforcement officer as the civil authority and the acts of other officers as ones taken under the senior officer's authority. That is not the argument Marysville Mutual has

made. We have already noted that its summary-judgment motion was premised on the proposition that a "search warrant like the one executed [here] is a government order." And on appeal, Marysville Mutual has argued that "the damages occurred . . . as a direct result of the lawful execution of a valid court order [the search warrant] by duly-authorized law enforcement officers." If the argument had been made that verbal on-scene orders from a law-enforcement supervisor on how best to arrest someone like Garcia constituted an "order of civil authority," then rules for the interpretation of insurance contracts might well have come into play. "Order of civil authority" seems to have the sense of some formal order, likely issued in writing, not the verbal directions of a lead law-enforcement officer at a fluid standoff with an armed suspect. And if there are two viable interpretations for a provision in an insurance contract, we must construe the ambiguity against the insurance company. *Bussman*, 298 Kan. at 707. But Marysville Mutual has not claimed that on-scene orders from law enforcement officers constituted the "order of civil authority" in this case. Rather, the insurance company here has consistently argued that the order at issue was the search warrant issued by a judge.

Since the exclusion does not apply, the district court improperly granted Marysville Mutual's summary-judgment motion. It should have been denied.

We turn next to the Allens' motion, which sought partial summary judgment. The Allens asked the district court to determine that Marysville Mutual was liable under the policy, while leaving the amount of the loss, which was contested, for trial.

On the record presented to the district court, we cannot determine whether Marysville Mutual is in fact liable under the policy. On appeal, the Allens focused primarily on the legal question of whether the district court's reliance on the policy exclusion was in error, not on the factual basis the Allens had presented to the district court for coverage.

The Allens argued to the district court that the loss was covered by the vandalism provision. As a factual basis for that claim, the Allens cited Kenny Allen's testimony that he understood that Garcia had broken a window in the garage and then gone through the broken window. In response, Marysville Mutual cited a statement Garcia apparently made to officers that he had entered the house through an unlocked door. Allen didn't explain how he came to have his understanding of these facts, so we can't say whether it's based on personal knowledge (as needed on a summary-judgment motion, see K.S.A. 2016 Supp. 60-256[e]) or on hearsay. And Marysville Mutual's evidence on this point is mere hearsay. So the evidence wasn't sufficient to conclude that undisputed evidence showed that Garcia's entry to the home was facilitated by vandalism.

If the evidence shows that Garcia committed vandalism (a covered risk) to enter the home, then the loss would be covered because police efforts to dislodge him would have been reasonably foreseeable under the circumstances. But that wasn't shown to be an undisputed fact, so the district court properly denied the Allens' summary-judgment motion.

Before we close our opinion, we will comment on one other matter. While the Allens made several arguments about why the policy exclusion for "a loss which results from order of civil authority" did not apply, the Allens did not specifically focus on the "results from" language. They argued, among other things, that there was no order from a civil authority given ambiguities in that term and that terms in an insurance policy should be strictly construed against the insurer. Under these circumstances, Marysville Mutual may think we have raised some new issue on our own motion on appeal.

We have not. The issue before us was whether the policy exclusion applied. The key facts were undisputed, and the key language of the policy exclusion ("a loss which results from order of civil authority") consists of only nine words. Our obligation was to apply that provision to the undisputed facts of our case. Similar situations arise frequently

13

in statutory-interpretation cases. When parties cite to the proper statute and argue about its application to the facts of a case, our duty is to correctly interpret and apply the statute, not to limit ourselves to the exact meanings attributed to the statute by each party. In this case, we are interpreting a provision that is found not only in the Allens' insurance policy but in many policies. Our duty is to correctly interpret the provision all parties cited to and then to fairly apply it to the facts of our case.

We reverse the district court's judgment and remand this case for further proceedings.