NOT DESIGNATED FOR PUBLICATION

No. 119,521

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES LLOYD MOORE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER JR., judge. Opinion filed May 22, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett,* district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and BUSER, JJ.

BUSER, J.:  Charles Lloyd Moore appeals his conviction in Sedgwick County District Court for possession of marijuana, possession of drug paraphernalia, and criminal use of a weapon. Moore contends the district court erred by denying his motion to suppress evidence, denying his motion for mistrial, and giving the jury an improper reasonable doubt instruction. Upon our review we find no reversible error and, therefore, affirm the convictions.

FACTUAL AND PROCEDURAL BACKGROUND

At about 6:30 a.m. on November 12, 2016, Wichita police officers responded to multiple reports of gunfire in the area of Seneca Street and Harry Street. Several officers blocked off the intersections leading to the area and walked the streets attempting to discover evidence of a shooting. Officer Casey Richwine was personally contacted by one of the reporting parties, who directed him to a block just west of Fern and Merton Streets. This person told the officer that at the time of the shooting someone ran toward Fern Street, entered a vehicle, and drove away.

As he walked west along Merton Street, Officer Richwine found shell casings on the roadway. In particular, the officer found five shell casings in the road in front of a residence on West Merton. Officer Richwine also discovered some bloody clothing on the curb in front of the house. Moreover, a motor vehicle parked in the driveway appeared to have been damaged by bullet strikes, and the house also had bullet holes. In Officer Richwine's opinion, based on the apparent trajectory of the bullets, he believed that someone had been in the street east of the residence and shot a firearm towards the residence. Other officers soon arrived at the scene.

Officer Brock England walked up to the porch and observed blood on the inside of the storm door. Officer England knocked on the front door for two to three minutes without any response. According to the officer:

> "I knocked three times very hard and announced, 'I'm the Wichita Police Department,' I'm there to check their welfare. I continued to do that. And after the fourth and fifth attempt of me knocking and announcing like that, I then tell them I am checking their welfare and if I have to, I will—I will open the door by force."

Officer Richwine contacted his supervisor and discussed the results of his initial investigation for about two or three minutes. According to the officer, "We discussed that

we probably needed to go inside the residence to check any welfare of anybody that may have been injured in the incident." Following this discussion, the supervisor authorized a forced entry into the residence to conduct a welfare check of its occupants.

Officer England began kicking the front door to force it open. He kicked the door about six times without success. While Officer England was kicking the door, Moore came to the door and told the officers he would attempt to open it. When he was unsuccessful, Moore told the officers that the door was now jammed, he would leave the residence from the back door, and he would meet them at the front of the house.

Moore left the house out the back door and met Officer Richwine at the gate for the privacy fence that enclosed the backyard. Officer Richwine turned Moore over to the custody of another officer, who stood with Moore by the gate. The officers asked Moore if anyone was still in the house. He responded that there was a woman in the house.

Officer Richwine, Officer England, and Sergeant Vogel went through the gate and into the backyard to conduct a search for a wounded gunshot victim inside the house. The property consisted of two structures at right angles from one another; one structure faced Fern Street and the other faced Merton Street. The officers first entered the building facing Fern Street where they found no one inside. The officers then entered the structure facing Merton Street through the back door.

An officer standing with Moore noticed a surveillance camera on the front porch and asked Moore if it was operating. Moore replied, "Well, I don't know. Maybe you can tell me seeing as three of your officers are already in my house." The officers later seized the digital video recorder attached to the camera. While the search of the house continued, Moore was seated in a patrol car.

As Officer Richwine, Officer England, and Sergeant Vogel conducted the search of the house for an injured occupant, the officers found Peggy Silva asleep in a bedroom. She was uninjured. Silva was led from the house, arrested on a bench warrant, and taken to jail.

Moving through the various rooms of the house, the officers observed several firearms in plain view. According to Officer Richwine, the firearms were the only evidence of wrongdoing he observed during the walkthrough. He testified that the officers did not any open any small containers; they were "just there to check for people." After the officers finished their search of the house, they left the residence. Officer England then went to obtain a search warrant based on the evidence of the shooting and the number of firearms found inside the house.

Meanwhile, Officer Richwine went to speak with Moore, who remained seated in the patrol car. At the beginning of the interview, Moore requested shoes and a jacket from the living room which the officer retrieved for him. Officer Richwine provided Moore with *Miranda* warnings in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Moore agreed to talk but he claimed that the officer did not ask him any questions. According to Officer Richwine, however, Moore admitted that he lived at the residence and he had been sleeping before the officers arrived. When Officer Richwine asked Moore why he was dressed in street clothes, Moore replied that he slept in street clothes. Moore also told the officer that a man owed him money and they had been arguing the previous evening.

Officer England obtained a search warrant for the residence. The warrant authorized a search of the residence for firearms and evidence related to the early morning shooting. Officers found and seized as evidence several types of weapons, including handguns and a sawed-off shotgun.

When he entered the house to execute the search warrant, Officer Robert Thatcher smelled marijuana. As he searched a cabinet in the living room, Officer Thatcher found water pipes or bongs typically used to smoke marijuana. He also found empty plastic bags, digital scales, and a metal grinder on a coffee table in the living room. Near the scales, Officer Thatcher found a piece of cardboard listing "nickels," "dimes," and "quarters." A dollar amount was written next to each word. About a half ounce of marijuana was found on a shelf underneath the coffee table. Also found nearby was another set of digital scales, glass pipes, and packaging material. A black notebook that listed names with amounts beside each name was also found.

A pair of shorts or pants was lying on the living room couch. Officer Thatcher searched inside the front pockets and found more than $6,000. The officer did not seize any of the drug evidence but ordered a stop to the search in order to obtain an amended warrant to include the drug evidence.

After Officer Thatcher obtained the amended search warrant the officers reentered the residence. During this search, officers seized about 35 firearms, including the sawed-off shotgun and the drug evidence previously discovered. Moore was arrested on firearm and drug charges and taken into custody.

On the morning of November 14, 2016, Wichita Police Detective Jeremy Miller interviewed Moore at the jail. Detective Miller again provided Moore with *Miranda* warnings, and Moore agreed to speak with him. During the interview, Moore stated that someone had brought him the sawed-off shotgun to fix—presumably to replace the barrel to a legal length. Moore admitted that the marijuana found in the house was his but claimed it was for personal use.

The State charged Moore with possession of marijuana with the intent to distribute, possession of drug distribution paraphernalia, criminal use of a weapon, and

defacing identification marks on a firearm. The complaint was later amended to charge Moore with possession of marijuana with two prior convictions, rather than possession of marijuana with the intent to distribute. Moore waived preliminary examination on the amended charge.

Prior to trial, Moore filed a pro se motion to suppress evidence obtained as the result of an illegal search of his home. Appointed counsel later filed another motion to quash the search warrants and suppress evidence because of the allegedly illegal initial entry into Moore's residence. Following an evidentiary hearing, the district court denied the motions. The district judge made the following findings:

> "There doesn't seem to be much of a dispute as to what the State alleged which is reports of shots fired in the neighborhood. We had shell casings from some rounds that were apparently fired in that vicinity as those shells were found in front of the home which would at least tie the possible discharge of those rounds to that immediate vicinity.
>
> "Officers testified they found what appeared to be some sort of bloody clothing or bloody rag on the curb there. What they believed to be blood inside the front glass door—screen door there. And then what appeared to them to be bullet strikes or hits on both the car in the driveway and the home itself. Officers also testified that in knocking on the door they did not see a response for approximately 2-1/2 minutes.
>
> "All that, in my opinion, would be sufficient for these officers to have at least the requisite level of concern to think that someone might be in the home who had been injured or shot requiring assistance. And enough to qualify as exigent circumstances under that situation."

A jury trial was held on September 25, 2017. The State voluntarily dismissed the charge of defacing identification marks on a firearm. At trial, Moore presented a general denial of the remaining criminal charges, specifically denying that he possessed any contraband, such as marijuana, drug paraphernalia, or illegal firearms. Moore was convicted of the three remaining charges.

Moore filed a motion for new trial and a motion for judgment of acquittal. The district court denied the motions. On November 17, 2017, the district court sentenced Moore to a controlling sentence of 26 months but granted him 12 months' probation.

Moore filed a timely appeal of his convictions.

MOTION TO SUPPRESS EVIDENCE

Moore challenges the district court's denial of his motions to suppress evidence. He contends that the initial entry into his residence by Wichita police officers was not justified by the emergency aid doctrine or, if so justified, it exceeded the permissible scope of the search. Consequently, Moore asserts that all evidence obtained as a result of the illegal initial entry should have been suppressed.

As a preliminary matter, the suppression issue was properly preserved through Moore's pretrial motions to suppress and timely objections to the admission of evidence at trial.

Appellate courts apply a mixed standard of review. The reviewing court extends deference to the district court's factual findings, adopting those findings if the record contains substantial competent evidence to support the findings. If, when making its factual findings, a district court is required to weigh competing evidence or assess a witness' credibility, those determinations are not subject to review. Substantial competent evidence is legal and relevant evidence sufficient to lead a reasonable person to accept a given conclusion. Once an appellate court has ascertained the determinative facts, the court then applies unlimited review of the district court's ultimate legal conclusions regarding suppression by applying those facts to the applicable law. See *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019).

The Fourth Amendment to the United States Constitution prohibits the government from conducting unreasonable searches and seizures. A warrantless search is unreasonable unless it is properly classified as one of a limited number of constitutionally recognized exceptions. *State v. Hubbard*, 309 Kan. 22, 33, 430 P.3d 956 (2018). The government bears the burden of establishing that a warrantless search is justified by a valid exception to the warrant requirement. *State v. Overman*, 301 Kan. 704, 710, 348 P.3d 516 (2015). Entry onto property that violates the Fourth Amendment constitutes an illegal search because of the potential for obtaining information protected by a legitimate privacy interest. *Reeves v. Churchich*, 484 F.3d 1244, 1258 (10th Cir. 2007).

The Fourth Amendment inquiry in this case is a narrow one. Moore only challenges the propriety of the Wichita police officers' initial entry into his home and the scope of that search. He then presumes that the subsequent searches authorized by search warrants were tainted by information obtained in the initial illegal entry. See *State v. Epperson*, 237 Kan. 707, 718-19, 703 P.2d 761 (1985) (evidence discovered as result of Fourth Amendment violation subject to exclusion as fruit of poisonous tree). Moore does not separately challenge the adequacy of the two search warrants, or the scope of the searches conducted under the authority of those warrants. As a result, those legal issues are not before us. For its part, the State justifies the entry into Moore's residence under the emergency aid doctrine. It does not provide any alternative justification for the officers' warrantless entry into Moore's home.

The emergency aid doctrine is a recognized exception to the warrant requirement under the Fourth Amendment. See *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014); *State v. Ritchey*, 56 Kan. App. 2d 530, 534, 432 P.3d 99 (2018). A warrantless search is permitted when law enforcements officers reasonably believe that a person needs immediate aid. *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Neighbors*, 299 Kan. at 242. "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or

8

emergency.'" *Mincey*, 437 U.S. at 392-93 (quoting *Wayne v. United States*, 318 F.2d 205, 212 [D.C. App. 1963]).

In Kansas, the seminal emergency aid case is *Neighbors*, wherein our Supreme Court established the parameters of the exception:

"[T]he emergency aid exception must be seen as a limited exception permitting a warrantless search when: (1) law enforcement officers enter the premises with an objectively reasonable basis to believe someone inside is seriously injured or imminently threatened with serious injury; and (2) the manner and scope of any ensuing search once inside the premises is reasonable." *Neighbors*, 299 Kan. at 249.

On appeal, Moore claims the first part of the test adopted in *Neighbors* was not satisfied under the facts of this case. He argues that the State failed to establish the bullet marks in the vehicle and the house were recently made or corresponded to the shell casings in the street. Moore also attempts to distinguish the circumstances of his case from other cases applying the emergency aid doctrine in that the officers did not directly witness the situation warranting emergency assistance.

Moore's attempts to limit the emergency aid doctrine to situations in which the officers are called to a particular residence or personally witness an event requiring emergency assistance is not supported by caselaw. As the United States Supreme Court noted, the primary test is whether the officers reasonably believe that a person in the searched area is in need of assistance. See *Mincey*, 437 U.S. at 392. If an officer reasonably believes that the health or welfare of someone might be in danger, the officer is justified to enter the home without a warrant. Contrary to Moore's position, the Fourth Amendment does not require law enforcement to tie the emergency to a particular residence if a wide search is reasonable under the circumstances. *Kendall v. Olsen*, 237 F. Supp. 3d 1156, 1166 (D. Utah 2017) (searching the neighborhood for a missing toddler).

9

Similarly, law enforcement officers do not need ironclad proof of the existence of a serious or life-threatening injury. See *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009).

> "It was error for the Michigan Court of Appeals to replace that objective inquiry into appearances with its hindsight determination that there was in fact no emergency. It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances. But '[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.' It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else. [Citation omitted.]" *Fisher*, 558 U.S. at 49.

Did the Wichita police have an objectively reasonable basis to believe someone inside Moore's residence was seriously injured or imminently threatened with serious injury? Given the totality of circumstances we believe there was an objectively reasonable basis for the warrantless entry. Six reasons, supported by facts in the record, bolster our legal conclusion.

First, Wichita police officers were dispatched to the area because several citizens reported they had just heard gunshots being fired in the neighborhood. As a result, this was an emergency, rife with danger, which required an immediate police response. One of the citizen complainants—an eyewitness—also personally directed Officer Richwine to the block near Moore's residence, where the suspected assailant entered his car and drove away.

Second, the officers recovered five shell casings in the roadway in front of Moore's residence. These shell casings, found in the vicinity where the gunshots were heard, provided confirmation of the citizen reports of hearing shots fired.

Third, bullet holes found in the vehicle parked in Moore's driveway and in his residence, according to Officer Richwine, provided evidence that the shooter was discharging a firearm from the street in front of Moore's home in the direction of Moore's property.

Fourth, a blood-stained piece of clothing was found on the curb near where the spent shell casings were found. Coupled with the report of gunshots and the presence of shell casings in the street, the discovery of bloody clothing on the curb nearby suggested that someone had been shot and injured by gunfire at this location. Blood was also found on the inside of the storm door at the front of Moore's residence. A reasonable inference based on the discovery of blood at two separate locations at the crime scene was that the assailant shot and wounded someone who then entered the Moore residence through the front door.

Fifth, Officer England knocked loudly at the front door of Moore's residence while identifying himself as a police officer and informing anyone inside that he was there to check the welfare of the occupant(s). These loud noises continued for two to three minutes without any response. Finally, on Officer England's fifth attempt at knocking loudly on the front door, the officer informed any occupant(s) that he was going to enter the residence by force. Following this unsuccessful attempt at contacting someone inside the residence, two or three minutes elapsed while Officer Richwine discussed the situation with his supervisor. In summary, for four to six minutes after first loudly knocking at the front door, the officers had been unable to contact anyone inside the residence.

11

Sixth, Officer England commenced to forcibly kick the front door about six times without any success. Only after these attempts, Moore—dressed in street clothes—finally responded to the commotion and attempted to open the door. When asked if anyone else was in the house, Moore confirmed that a woman was still inside.

Collectively, we are persuaded that these six inferences based on known facts would prompt a reasonable law enforcement officer to investigate the probability that a person inside Moore's residence had just been shot, was bleeding, and needed medical help. Here, while other conclusions could be inferred from these circumstances, officers responding to the emergency involving a deadly weapon with the likelihood of an injured person, necessarily needed to act quickly and without the advantage of an investigation. See *Fisher*, 558 U.S. at 49 (explaining that assessment of emergency is not conducted with the benefit of hindsight); *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002) ("The possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating immediate search.").

Moore's answering the door in response to the officers' knocking and kicking also did not dispel the reasonable belief that someone might be in danger in the residence. On the contrary, it only heightened the suspicion. Moore did not answer the door after several minutes of loud knocking and after Officer England's stated intention to kick the door down. Moore only appeared after six kicks damaged the door which made it apparent that the officers were forcibly entering the residence. Moreover, when he appeared at the door, Moore was dressed in street clothes, although he later told officers that he had been asleep while wearing the clothes.

In short, the long delay in Moore coming to the front door, and only after it was obvious that the police were forcibly coming inside the residence, added to the imperative to search the house to look for a wounded gunshot victim. Similarly, under these circumstances, Moore's exit from the residence to speak to the officers and advise them

12

that a woman remained inside should not have dispelled the officers' reasonable belief that someone inside the residence may be injured. *Neighbors*, 299 Kan. at 251 ("[A]n officer may continue an emergency investigation until assured there is no one inside in need of assistance—particularly when the officer encounters circumstances that continue to raise suspicions."); *United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006) (emergency aid exception did not require officers to accept occupant's statement that everything inside the residence was fine; emergency situation authorized the officers to check the rest of the trailer even after finding an uninjured woman).

We hold under the totality of circumstances, that the officers' entry into Moore's residence to conduct an emergency search for a wounded gunshot victim was reasonable and, therefore, justified under the emergency aid exception. See *Neighbors*, 299 Kan. at 249.

Moore also challenges the scope of the officer's emergency search of the residence. He asserts that "the officers' actions far exceeded the scope of a proper emergency aid search." In particular, Moore claims that once the officers found Silva in a bedroom asleep and uninjured "the police's intrusion into Mr. Moore's house should have ended. They had no reason to believe there was anybody else in the house, and no reason to continue searching." The State counters that the officers "simply conducted a person sweep of the residence, removed Silva, and assessed whether there were any other individuals located within the home. Once that task was completed, they exited the home."

There is substantial competent evidence that the scope of the initial search was limited to searching for an injured person. Upon determining that no such person was in the residence, the officers promptly left. Since the officers were authorized to enter the residence without a warrant under the emergency aid exception, they could conduct a search tailored to ascertaining whether anyone needed medical assistance. *Neighbors*, 299

13

Kan. at 251-52. However, the officers were not required to limit their search for a wounded gunshot victim upon finding the one woman, Silva, who Moore reported was inside the residence. See *Najar*, 451 F.3d at 720. There is no evidence that the officers exceeded the permissible scope of the emergency aid search by looking in additional areas of the residence for an injured person after they encountered Silva.

MOTION FOR MISTRIAL

Moore challenges the district court's denial of his motion for mistrial based upon Detective Miller's trial testimony that during an interview Moore exercised his right to talk to an attorney. Moore argues that this answer violated *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). For its part, the State candidly concedes "the exchange should not have transpired," but argues that it was harmless error.

During the trial the following colloquy occurred between the prosecutor and Detective Miller:

> "Q. Did Mr. Moore ever indicate that he wanted to talk to a lawyer when he was talking to you?
> "A. Yes. There was a DVR at the house that I requested permission to view the contents. And he stated, no, and that he would like to talk to a lawyer. At that time, I ended my interview with him.
> "Q. Understood."

Out of the presence of the jury, defense counsel sought a mistrial because the officer had commented on Moore's invocation of his right to an attorney in violation of *Doyle*. The district court reserved judgment on the motion for mistrial, indicating that it would wait until all the evidence had been admitted. The district court, however, promptly admonished the jurors:

14

"Any testimony or comment concerning a citizen's right to counsel is improper and not admissible in a criminal trial. The defense objected here at the bench to the question that was asked and the answer given. The defendant's objection to the question and to Detective Miller's answer is sustained. The jury is directed to disregard the answer. The jury cannot consider the implication or assertion of such constitutional right in its deliberations or verdicts."

At sentencing, the district court denied the motion for mistrial.

Appellate review of a district court's ruling on a motion for mistrial is limited to determining whether the district court abused its discretion in evaluating the motion. Judicial discretion is abused when it is premised on an error of law or fact or is otherwise arbitrary, fanciful, or unreasonable. *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015). A decision is arbitrary, fanciful, or unreasonable when no reasonable person in the position of the district court would have rendered the same decision. *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017).

Under K.S.A. 22-3423(1)(c), a district court may order a mistrial if it concludes that prejudicial conduct renders a continuation of the trial impossible without injustice to either party. In evaluating a motion for mistrial, the district court must first decide if there is prejudicial conduct that results in a fundamental failure in the proceeding, which means that prejudice makes it impossible to proceed without injustice to either party. If there has been a fundamental failure in the proceeding, the district court must consider whether the damaging effect can be cured or mitigated by an admonition to the jury, a jury instruction, or other action. If the prejudice cannot be cured or mitigated, the district court must consider whether the degree of prejudice can be declared harmless. *Moyer*, 302 Kan. at 906.

A *Doyle* violation ordinarily occurs when the State uses a criminal defendant's silence after being informed of his or her rights under *Miranda* for impeachment

15

purposes at trial. Such impeachment violates a criminal defendant's right to due process. *State v. Hernandez*, 284 Kan. 74, Syl. ¶ 3, 159 P.3d 950 (2007). Of particular relevance to the case on appeal, *Doyle*'s prohibition against impeachment with a defendant's invocation of constitutional rights extends to the right to counsel. See *State v. Cosby*, 285 Kan. 230, 245, 169 P.3d 1128 (2007) (citing *Doyle*, 426 U.S. at 618).

Was this a *Doyle* violation? Moore never invoked his right to remain silent and initially conversed with Detective Miller. Only after the detective requested permission to look at the surveillance video did Moore invoke his constitutional right by asking to speak to an attorney. This situation is very similar to the circumstances in *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006) ("This is not a case, as in *Doyle*, where a defendant was silent when first contacted by law enforcement officers. Anthony was not silent. When interrogated, he confessed. He never invoked his right to silence. And he invoked his right to counsel only after the cat was out of the bag. [Citation omitted.]"); see also *Greer v. Miller*, 483 U.S. 756, 764-65, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (holding that impeachment of a defendant with evidence that defendant invoked constitutional rights is not a *Doyle* violation if the court sustains the objection to the impeachment; instead, the violation is analyzed as prosecutorial misconduct).

Nevertheless, although the prosecutor had no valid reason for eliciting the information from Detective Miller, the prosecutor prompted the detective's improper testimony. Moreover, the detective's response had no material purpose in proving Moore's guilt of the crimes with which he was charged. See *State v. Elnicki*, No. 110,516, 2015 WL 1882098, at *5 n.1 (Kan. App. 2015) (unpublished opinion) ("The prosecutor seems to have elicited the information with the aim of impairing the credibility of the witnesses, implying their reliance on legal representation equates to untrustworthiness."). These facts and circumstances—and the State's concession of error—persuade us that the prosecutor's question and the detective's response were improper.

The district court's decision not to grant Moore's motion for mistrial was not error if the *Doyle* violation is deemed harmless. See *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016). We are persuaded that the detective's comment did not deprive Moore of a fair trial under the unique circumstances of this case. During the interview with Detective Miller, Moore freely admitted to possessing the firearms and smoking marijuana—admissions he contradicted at trial by denying possession of the firearms or drugs. Any *Doyle* violation had no effect on the admissibility of Moore's incriminating statements to Miller.

Additionally, Detective Miller's comment regarding Moore's invocation of his right to counsel was made in the context of discussing how the interview ended, shortly after Detective Miller requested Moore's permission to view the surveillance video. While the jury may have surmised that Moore's invocation of the right to counsel suggested guilt related to conduct depicted on the surveillance video, the video was not offered in evidence by the State and the prosecutor did not argue the point. Lastly, the district court strongly admonished the jury not to consider Moore's invocation of the right to counsel in its deliberations. It is well-settled Kansas law that an appellate court generally presumes that the jury followed the admonishment of the district court. See *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 (2010).

We hold that Detective Miller's comment on Moore's invocation of his right to counsel had a negligible effect, if any, on the jury's deliberations. The error was harmless beyond a reasonable doubt, and the district court did not abuse its discretion in refusing to grant Moore's motion for mistrial. See *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (applying constitutional harmless error test to *Doyle* violation).

17

Moore's final issue challenges the propriety of the district court's burden-of-proof jury instruction. He contends that the district court's instruction infringed on the jury's exercise of its power of nullification.

Moore objected at trial to the burden-of-proof instruction proposed by the district court. Accordingly, Moore's objection was properly preserved, and our court must consider whether the instruction, together with the other instructions, fairly stated the applicable law or whether the instructions caused juror confusion. See *State v. Butler*, 307 Kan. 831, 843, 416 P.3d 116 (2018). Since the instruction involves the burden of proof, any error is structural and may not be deemed harmless. See *Sullivan v. Louisiana*, 508 U.S. 275, 280, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *Miller v. State*, 298 Kan. 921, 923, 318 P.3d 155 (2014) ("[H]armless error analysis does not apply to a constitutionally deficient reasonable doubt instruction.").

The challenged jury instruction, Instruction No. 6, provided:

"The State has the burden to prove Mr. Moore is guilty. Mr. Moore is not required to prove he is not guilty. You must presume that Mr. Moore is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether Mr. Moore is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find Mr. Moore not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find Mr. Moore guilty."

As Moore points out, the Kansas Supreme Court has recognized that the jury has the power of jury nullification. See *State v. Osburn*, 211 Kan. 248, 255, 505 P.2d 742 (1973). It is clear error to instruct a jury that if it has no reasonable doubt about the

defendant's guilt, then the jury "'*will* enter a verdict of guilty.'" *State v. Smith-Parker*, 301 Kan. 132, Syl. ¶ 6, 340 P.3d 485 (2014). But our court has consistently held that using the word "should" in the burden of proof instruction is not the same as using a prohibited imperative like "must" or "will." See, e.g., *State v. White*, 53 Kan. App. 2d 44, 53-54, 384 P.3d 13 (2016); *State v. Allen*, 52 Kan. App. 2d 729, 735, 372 P.3d 432 (2016). By using the word "should" the district court appropriately maintained a balance between encouraging jury nullification and prohibiting it.

Lastly, the burden-of-proof instruction used here substantially reflects the language used in the pattern instruction found in PIK Crim. 4th 51.010. Our Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.' [Citation omitted.]" *Butler*, 307 Kan. at 847.

Moore has not provided a compelling argument that our court has not already previously considered and rejected. We are persuaded that the burden-of-proof instruction, together with the other jury instructions, fairly stated the applicable law and did not cause juror confusion. See 307 Kan. at 843.

Affirmed.

* * *

ATCHESON, J., concurring in part and dissenting in part:  The emergency aid doctrine permits law enforcement officers (and other government agents) to search places without warrants, as an exception to the Fourth Amendment to the United States Constitution, when they have objective reasons to believe someone there is in serious peril. In this case, however, Wichita police officers no longer had such an objective belief when they stormed into Charles Lloyd Moore's home. The Sedgwick County District Court should have granted Moore's motion to suppress the evidence of illegal activity the

19

officers found in his house. Although that result would have seriously impeded and perhaps prevented the successful prosecution of Moore, the Fourth Amendment requires suppression of impermissibly seized evidence in cases like these to deter law enforcement officers from invading the constitutional rights—and the homes—of innocent citizens. For that reason, I respectfully dissent from the majority's decision affirming the district court's ruling.

Before detailing why the district court and the majority have misapplied the Fourth Amendment, I mention what they have gotten right. The prosecutor improperly questioned a detective during the trial in a way that disclosed to the jurors Moore had asked to speak with a lawyer after the detective informed him of that right as part of the standard *Miranda* warnings given a suspect at the start of a custodial interrogation. See *Wainwright v. Greenfield*, 474 U.S. 284, 295 & n.13, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986); *Jones v. Bagley*, 696 F.3d 475, 484-85 (6th Cir. 2012). But the question and answer did not deprive Moore of a fair trial, given the evidence against him and the district court's remedial instruction to the jurors. I, therefore, agree the error was harmless and the district court properly denied Moore's motion for a mistrial. I also agree the jury instruction on the State's burden of proof was proper, as this court has repeatedly held. I join in that part of the majority's opinion, as well.

*Fourth Amendment Principles*

The Fourth Amendment prohibits unreasonable government searches and seizures and typically requires government agents to obtain a warrant from a judge identifying the place to be searched and describing the things that may be seized. The text of the Fourth Amendment identifies "houses" as protected places. The framers favored no other location that way. And the courts have consistently recognized the protections of the Fourth Amendment serve their quintessential purpose at the door to a person's home. *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) ("At the

20

Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 [1961]); *State v. Dugan*, 47 Kan. App. 2d 582, 588, 276 P.3d 819 (2012) ("The rights secured in the Fourth Amendment are at their zenith when government agents attempt to enter a person's home."). I dispense with a recounting of the history of the Fourth Amendment and the abuses that prompted its inclusion in the Bill of Rights. See *Payton v. New York*, 445 U.S. 573, 583-85 & n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) (historical underpinning of Fourth Amendment protections for homes); *Stanford v. Texas*, 379 U.S. 476, 482, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965) (historical antipathy toward both the use of writs of assistance in the Colonies and the use of general warrants in England as animating inclusion of the Fourth Amendment in the Bill of Rights).

Warrantless searches of dwellings are considered presumptively unconstitutional. *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). But the courts have recognized limited exceptions to the warrant requirement, including consent to search, probable cause combined with exigent circumstances, and the emergency aid doctrine. *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). The emergency aid exception stands on a somewhat different legal footing from exigent circumstances more generally. Those exigent circumstances entail conventional law enforcement functions—taking suspected criminals into custody or securing evidence of crimes—where the delay to secure a warrant would thwart their accomplishment. The officers must have probable cause to believe the person seized has committed a crime or the place searched will yield evidence. The emergency aid exception neither implicates that kind of law enforcement action nor requires probable cause. *Brigham City*, 547 U.S. at 403; *Hill v. Walsh*, 884 F.3d 16, 23 (1st Cir. 2018). The emergency assistance exception applies when government agents enter a dwelling or other private place to help a person in serious peril. The agents must have a reasonable factual basis to believe a

21

potentially life-threatening emergency is imminent or ongoing, thus requiring immediate entry of a specific place to render help. *Neighbors*, 299 Kan. 234, Syl. ¶ 4.

As with much else in Fourth Amendment law, the reasonableness of the agents' determination rests on the totality of the circumstances. See *Missouri v. McNeely*, 569 U.S. 141, 168, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013) (Kennedy, J., concurring) (noting applicability of warrant exceptions including emergency aid doctrine turn on totality of circumstances); *Brigham City*, 547 U.S. at 406-07 (court examines circumstances surrounding officers' entry in applying emergency aid doctrine); *United States v. Timmann*, 741 F.3d 1170, 1181 (11th Cir. 2013). And the circumstances must support an objectively reasonable conclusion that an emergency is at hand, so an officer's subjective belief alone is legally insufficient. *Brigham City*, 547 U.S. at 404-05; *Neighbors*, 299 Kan. at 243. The intrusion must be confined to the purpose of the exception—rendering immediate aid in an emergency. Government agents may not turn an ostensible emergency into an opportunity to search for evidence. They must stand down as soon as they have rendered any necessary aid or the events unfold to reveal the absence of an actual emergency. 299 Kan. at 252; *State v. Edmonds*, 211 N.J. 117, 134, 47 A.3d 737 (2012) (In applying the emergency aid doctrine, the court recognized: "When the exigency that justifies immediate action dissipates, the rationale for searching without a warrant is no longer present.").

Before turning to the facts here, I explain what the majority ignores: The reason courts typically suppress evidence when government agents violate the Fourth Amendment. The exclusionary rule—barring the government's use of unconstitutionally obtained evidence in a criminal prosecution—deters those agents from engaging in and repeating like violations, thereby modifying their conduct and practices to conform to the requirements of the Fourth Amendment. See *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued application of

the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate.'"). The agents understand they cannot advance a criminal prosecution by violating the Fourth Amendment because any evidence they obtain will be unusable for that purpose. So they presumably will not engage in that unconstitutional behavior at all, thus preserving the Fourth Amendment rights of innocent citizens who otherwise would be victims of impermissible searches and seizures.

Only by exacting a penalty against the government in criminal prosecutions can those rights be meaningfully protected for everyone. *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (The exclusionary rule is "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'") (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]). Since illegal searches of innocent citizens' homes turn up no contraband or other evidence of crimes, there is no prosecution and nothing to suppress and, in turn, no efficacious remedy to independently punish those particular constitutional violations. The necessary cost of protecting every citizen's Fourth Amendment rights through the exclusionary rule lies in impeding and often effectively precluding the successful prosecution of a guilty defendant when his or her rights have been violated. Justice Robert Jackson explained the utility of the exclusionary rule and its seeming paradox nearly 75 years ago:

> "But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.
> "Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. . . .

23

"Courts can protect the innocent against such invasions indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. Federal courts have used this method of enforcement of the Amendment, in spite of its unfortunate consequences on law enforcement." *Brinegar v. United States*, 338 U.S. 160, 181, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) (Jackson, J., dissenting).

See also *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) (*Elkins* majority opinion quotes this passage of Justice Jackson's *Brinegar* dissent as aptly encapsulating the operation of the exclusionary rule). In short, without the exclusionary rule, government agents would have little or no tangible incentive to abide by the constitutional restrictions on their conduct outlined in the Fourth Amendment. We have struck a constitutional balance in which the benefit of protecting everyone's freedom from unreasonable government searches and seizures justifies that cost. And we should neither lose sight of that balance nor silently recast the protections of the Fourth Amendment in a given case because the constable's constitutional blunder has yielded a trove of guns and drugs.

*Standard of Review and Factual Record*

In reviewing a ruling on a motion to suppress, we afford deference to the district court's resolution of disputed facts but not its ultimate legal conclusion. The State must prove a search or seizure to be constitutional by a preponderance of the evidence. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). I see no material conflicts in the evidence bearing on the motion to suppress, so the issue turns on a narrow question of law: Did the totality of the circumstances present an objectively reasonable basis for the Wichita police officers to enter Moore's home under the emergency aid doctrine? See 304 Kan. at 274 (when material facts undisputed, issue presents question of law); *State v. Bennett*, 51 Kan. App. 2d 356, 361, 347 P.3d 229 (2015).

The evidence at the suppression hearing, presented principally through the testimony of three Wichita police officers and Moore, is basically consistent on the essential facts. I summarize those facts:

The Wichita police received calls from concerned citizens about 6:30 a.m. about shots fired in a neighborhood in the southwest part of the city. A patrol officer responded and found five shell casings in the street in front of Moore's house. He identified a bullet hole in the house and two in a car parked in the driveway. A resident of the neighborhood said she saw someone run from the vicinity of the shots, jump in a van, and drive off. Other officers quickly arrived, setting up a perimeter around Moore's house. They promptly found what was variously described as a cloth, rag, or T-shirt with blood on it at the curb. An officer saw blood on the front storm door of Moore's house. The hearing transcript does not include any further description of the blood on the door.

The officers inferred—entirely reasonably—that a person shot at Moore's house and car and then fled. They believed, equally reasonably, that someone had been injured, accounting for the bloody cloth or shirt and the appearance of the door. So they were concerned that someone now inside Moore's house might have been shot and would, therefore, be in need of medical assistance. Again, that's a reasonable assumption given those circumstances. An officer proceeded to knock loudly on the front door and announce he was with the Wichita police and need to "check the welfare" of anyone inside. Having received no response from inside, one of the officers then unsuccessfully attempted to kick open the front door. Reasonable still. As the testimony at the suppression hearing shows, the officers were in search of an injured crime *victim* needing help—an objective aligned with the emergency aid doctrine. They were neither in pursuit of a criminal suspect nor looking for incriminating evidence. And they weren't intervening to thwart a crime in progress.

25

After several minutes, Moore came to the front door. An officer asked him to open the door. Moore explained he couldn't because the officers had damaged it, so it was jammed shut. He said nothing about needing medical assistance. Moore either offered to come out the back door to meet the officers in front of the house or was asked to do so and agreed. I impute no particular legal significance to those differing descriptions. Either way, Moore went to the front of the house. The factual circumstances then dramatically shifted away from the officers' inference of an emergency. Moore rather plainly had no gunshot wounds or other injuries. An officer asked if anyone remained in the house. Moore replied a woman was inside. By all accounts, he responded without conveying any sense of alarm about her. Nobody inquired about her condition. Three officers instead immediately rushed to the backdoor, entered, and went room to room looking for an injured victim of a shooting. They found Moore's girlfriend—without injury—in the bedroom. In getting to the bedroom, they saw a number of firearms. The officers withdrew from the house, escorting Moore's girlfriend out. The officers then sequentially obtained two search warrants, the first for firearms and ammunition and the second for illegal drugs and associated contraband or other evidence. The search teams found lots of guns, drugs, and other contraband.

At the suppression hearing, one of the officers testified that a police department policy required a "security sweep" of the interior of the house to check for injured persons, since shots apparently had been fired. None of the witnesses elaborated on the policy, and a written policy was not produced at the hearing.

The State has consistently relied solely on the emergency aid doctrine to justify the entry into Moore's house and the initial search. The facts lend themselves to no other exception to the Fourth Amendment's warrant requirement. The officers did not purport to be acting under exigent circumstances tied to a conventional law enforcement function, such as hot pursuit of a wanted felon or apprehension of an armed suspect posing an immediate danger. Likewise, Moore indisputably did not consent to a search of his home,

thereby obviating the need for a warrant. In addition to challenging the officers' initial entry, Moore has argued the way they searched for injured victims was constitutionally unreasonable. See *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (A search or seizure lawful at its inception may violate the Fourth Amendment if the government agents act unreasonably in the way they carry it out.); *United States v. Edwards*, 666 F.3d 877, 883-84 (4th Cir. 2011). The record doesn't support his claim about the manner of the search itself. Moore has not asserted additional challenges to the searches the officers conducted after obtaining the warrants.

*Principles Applied to the Facts*

As I have indicated, the suppression issue rises and falls on whether the emergency aid doctrine covers the officers' backdoor entry into Moore's home after he emerged from there unharmed to talk with officers at the front door. At that juncture, the officers were trying to determine if an apparent attack on the house had left any injured victims inside. Moore's appearance strongly dispelled that concern. He was uninjured and did not ask the officers for help with someone else. Nor had he made a 911 call for medical assistance. The circumstances no longer conveyed a dire urgency. And an immediate invasion of the home was constitutionally unreasonable, since the officers at that time considered Moore to be a crime victim. The officer coordinating the tactical law enforcement presence could have easily and quickly asked Moore if the woman in the house needed medical help. That would have been both commonsensical and constitutionally reasonable. Even if the officers doubted a response from Moore that his girlfriend was fine, they could have asked to speak with her. Equivocation or apparent dissembling from Moore might have rekindled a constitutionally reasonable basis to enter the home under the emergency aid doctrine.

Moreover, one of the officers represented at the suppression hearing that they entered Moore's home based on a departmental policy. A law enforcement policy or

routine practice cannot justify a warrantless entry into a home that otherwise violates the Fourth Amendment in light of the factual circumstances. See *State v. White*, 44 Kan. App. 2d 960, 971, 241 P.3d 591 (2010) (officer's practice of patting down driver for weapons in every traffic stop even absent reasonable suspicion violates Fourth Amendment); *State v. Burks*, 15 Kan. App. 2d 87, 94, 803 P.2d 587 (1990) ("standard procedure" of patting-down hitchhikers without regard to reasonable suspicion violates Fourth Amendment); *United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012) (law enforcement officers cannot constitutionally justify protective sweep of residence upon executing arrest warrant based on "their standard procedure" and must rely on "'articulable facts'" establishing reasonable belief person there posed danger to them); *United States v. Williams*, 577 F.3d 878, 881 n.3 (8th Cir. 2009) (protective sweep of home cannot be based on "'standard procedure'"). A policy or procedure ostensibly permitting government agents to search homes or other places cannot substitute for inadequate factual circumstances to salvage a constitutionally infirm incursion. That would be functionally no different from a forbidden general warrant.

Here, the dissipation of the circumstances inferentially supporting the emergency aid doctrine required the officers to cease their attempt to enter the home of an apparent crime victim who obviously had no injuries. The officers' charge through the back door violated the Fourth Amendment. In short, objective reasonableness under the emergency aid doctrine creates no irrevocable threshold that once crossed cannot be undone by new facts in the evolving totality of the circumstances. See *Edmonds*, 211 N.J. at 134. And apparent crime victims who explain to officers at their front doors that they and their guests are fine should not then be subject to home invasions without some substantially greater factual justification.

The circumstances here are unlike those in the leading United States Supreme Court cases shaping the present iteration of the emergency aid doctrine. *Michigan v. Fisher*, 558 U.S. 45, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009); *Brigham City*, 547 U.S.

398. In *Fisher*, as officers responding to a disturbance call approached a house, they saw a pickup with significant damage to the front end that corresponded to damage to a fence. The house had three freshly broken windows. There was blood in the truck and on a door to the house. The backdoor was locked, and the front door barricaded. The officers saw a man with a bloody cut to his hand standing in the living room, screaming and throwing things. They could not determine if he was throwing the objects at someone else. The Court found those circumstances supported a warrantless entry based on the emergency aid doctrine. 558 U.S. at 48. Similarly, in *Brigham City*, police officers responded to call about a loud party at a residence in the middle of the night. On approaching the house, the officers saw four adults attempting to restrain a juvenile, who then broke free and punched one of the adults. The adult was spitting up blood, and the physical confrontation showed no signs of ending. The Court found the emergency aid doctrine supported officers' warrantless entry of the house both to assist the injured adult and to prevent further injuries. 547 U.S. at 406. Those cases do not, of course, establish the constitutional threshold required to satisfy the emergency aid doctrine, but they are illustrative of sufficient circumstances and contrast to the slender inferences, undone by Moore's appearance, at play here.

Closer to the line and closer to home is this court's recent opinion in *State v. Fisher*, 57 Kan. App. 2d 460, 453 P.3d 359 (2019), applying the emergency aid doctrine to another intervention by the Wichita police. A woman identifying herself as Teresa placed a 911 call saying a person had been shot at an address she provided. Several officers converged on the house at the address. They saw a man arguing with two women in front of the house. As the officers pulled up, the man ran, and at least several officers went after him. Another officer asked the women if they were hurt. They said they were not. The officer did not tarry to find out if either of them happened to be Teresa (one of them was), if they lived there, or if they were aware of someone having been shot. He and another officer entered the house apparently without having to force their way in. Their search revealed no gunshot victim, but they found Fisher unharmed in the basement with

29

marijuana plants in plain view. The panel (on which I sat) upheld the warrantless entry and search under the emergency aid doctrine. 57 Kan. App. 2d at 467-68.

There are several material differences between this case and *Fisher*. The initial call to the police in that case referred specifically to the victim of a gunshot injury being inside a house at a given address. That was the identified emergency. The man fleeing the scene enhanced the likelihood of something being amiss. See *State v. Phillips*, 295 Kan. 929, 947-48, 287 P.3d 245 (2012) (flight from crime scene or law enforcement officers may be circumstantial evidence of guilt). The officers had no reason to immediately connect the women to the house, although they had been talking to the man. And after determining neither woman was the gunshot victim, the officers had no obligation to play 20 questions with them to figure out what, if anything, they had to do with the 911 call. Here, the initial call was of shots fired in a neighborhood. The officers inferred there *might* be someone injured in Moore's house—an inference dispelled by Moore's appearance and his failure to request medical assistance for himself or his girlfriend. The officers should have recalibrated their assessment of the circumstances and asked Moore about his girlfriend's condition. Their entry into his home based either on the circumstances as they were or on the departmental policy was constitutionally unreasonable, a result consistent with *Fisher*.

As the suppression issue has been framed for us, the seizures of the guns, drugs, and other contraband from Moore's home were impermissibly tainted by the wrongful initial entry. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (evidence suppressed as "'fruit of the poisonous tree'" when directly derivative of violation of defendant's Fourth Amendment rights). They should have been excluded as evidence against Moore. Their admission during the jury trial amounted to reversible error.

30

*The Majority's Approach*

The majority averts that result in several unpersuasive ways. For example, the majority announces "[s]ix reasons . . . [that] bolster our legal conclusion," as if there were multiple points of law supporting the entry of Moore's home. See slip op. at 10. Instead, the majority simply fractures the totality of the circumstances into pieces and offers each as an independent basis justifying the officers' actions. The first five collectively do create a reasoned belief the victim of a gunshot wound might be in the house. But the sixth—Moore's appearance unharmed at the front of the house—offers an entirely contrary picture, negating the inference. The officers, of course, didn't ask Moore if his girlfriend was hurt. And without anything in his comportment to suggest she was in peril, the officers stormed in. The majority, in conclusory fashion, pronounces the circumstances good enough.

Similarly, the majority recites at length the district court's ruling, apparently to be taken as a legally sound backstop. In that part of its bench ruling, the district court outlined the factual circumstances up to the officers knocking on Moore's door without an immediate response. The district court pronounced those facts sufficient to justify a warrantless entry under the emergency aid doctrine. But, of course, the *totality* of the circumstances was markedly different. Although the district court went on to mention that Moore came out and spoke to the officers, it attributes no significance to Moore's appearance and never accounts for that part of the circumstances in its legal analysis.

Finally, the majority wrests observations about the emergency aid doctrine in several court opinions from their factual foundations to argue they support its desired outcome in this case on very different facts. That sort of uncoupling of factual underpinnings from isolated legal pronouncements can distort the ordered process of reasoning by analogy embedded in judicial decision-making. I have outlined that danger elsewhere and do not repeat the full discussion here. See *State v. Pollman*, 56 Kan. App.

31

2d 1015, 1041-42, 1048-51, 441 P.3d 511 (Atcheson, J., dissenting), *rev. granted* 310 Kan. 1068 (2019). The danger is redoubled when the proper legal outcome explicitly depends upon the totality of case-specific circumstances. So the majority quotes at some length from the United States Supreme Court's decision in *Fisher*—a discussion the Court itself ties to those facts without reiterating them—and pronounces the discussion precedent for affirming in this case. It isn't.

The majority similarly offers a brief parenthetical derived from *United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006), without considering the facts of that case or explaining why that observation should direct the outcome here despite the marked factual differences between that case and this one. The majority suggests *Najar* stands for the legal proposition that the emergency aid doctrine permits or requires government agents to disbelieve what someone on the premises of the purported emergency tells them. Well, no. The doctrine has no such a built-in legal corollary, and the Tenth Circuit does not suggest otherwise. The court found that the totality of the circumstances in that case readily supported the officers' conclusion that Najar was lying to them. 451 F.3d at 720.

In that case, a 911 operator received a call with an immediate hang-up at about 2 a.m. Consistent with the protocol for a hang-up, the operator called the number to inquire if anyone needed assistance. The call was answered followed by another hang-up. The operator placed three more calls with the same result and then requested the police go to the address. When the officers arrived at the mobile home, they saw and heard someone moving around inside. But their increasingly loud and vigorous knocking and identification of themselves as police officers went unheeded. A police sergeant arrived. All three continued trying to get the occupant to respond. About half an hour after the first officers got there, Najar opened the door. He told the officers he was there alone and had not called 911. As the court found, the officers, of course, had good reason to disbelieve Najar, and the repeated responses to calls from the 911 dispatcher strongly

suggested someone in danger but unable to speak. 451 F.3d at 720. (A benign response might have entailed an answer with an explanation that the initial call to 911was a mistake and everything is okay.) The officers entered without Najar's consent and found both an uninjured woman in the bedroom and a shotgun leaning against a wall in the living room area. As a convicted felon, Najar could not lawfully possess a firearm.

The court's determination that the officers properly disregarded Najar's representations to them rested entirely on the facts of that case showing him to be dissembling. But the court did not distill that factual conclusion into some general rule governing the emergency aid doctrine. Here, the constellation of facts known to the officers when they actually entered Moore's house didn't come close to approximating those in *Najar*.

The majority also relies on a quote from *Neighbors* enunciating as a general proposition: "[A]n officer may continue an emergency investigation until assured there is no one inside in need of assistance—particularly when the officer encounters circumstances that continue to raise suspicions." See *Neighbors*, 299 Kan. at 251. The *Neighbors* court determined the facts of that case didn't fit the proposition. Four police officers entered an apartment after the landlord reported finding someone other than the tenant unconscious and unresponsive in the living room. The officers aroused the individual (Neighbors) and determined he was in no immediate distress. In the meantime, two narcotics officers arrived and eventually searched Neighbors. They found a small bag of methamphetamine he had concealed in his underwear. The court held that the emergency aid doctrine justified the officers' entry into the apartment but not their continued stay or the search of Neighbors after they determined he was not in any peril. 299 Kan. at 249. There, the officers dispelled the emergency after their entry. Here, the factual circumstances dispelled the emergency before the officers entered Moore's home, and they "encounter[ed]" nothing that "continue[d] to raise suspicions." See 299 Kan. at 251. To the contrary, Moore's physical presence and comportment did just the opposite.

33

*Conclusion*

The Fourth Amendment extends an austere and fundamental protection to the privacy of our homes. Government agents may not cross the threshold of that protection or of a home without a judicially approved warrant or ample good cause. Crime victims do not surrender the constitutional sanctity of their homes simply because government agents may have assumed them to be in peril when the facts unfold to dispel that assumption. The courts have a duty to stand guard against government actions encroaching upon fundamental rights. In service of that duty, I would find a Fourth Amendment violation in this case and exclude the evidence seized from Moore's home.